## IN THE SUPREME COURT OF THE STATE OF IDAHO
### Docket No. 45200

| | | |
|---|---|---|
| **THOMAS LUNNEBORG,** | ) | |
| | ) | |
| **Plaintiff-Respondent,** | ) | **Lewiston, April 2018 Term** |
| | ) | |
| **v.** | ) | **Filed: June 28, 2018** |
| | ) | |
| **MY FUN LIFE, a Delaware corporation, EDWARDS E. EDWARDS and CARRIE L. EDWARDS, husband and wife,** | ) ) ) | **Karel A. Lehrman, Clerk** |
| | ) | |
| **Defendants-Appellants.** | ) | |
| _____ | ) | |

Appeal from the District Court of the First Judicial District of the State of Idaho, Kootenai County. Hon. John T. Mitchell, District Judge.

The district court's judgment is <u>affirmed</u>. Attorney fees and costs on appeal are <u>awarded</u> to respondent.

Merrill & Merrill, Chartered, Pocatello, and Hague Law Offices, Coeur d'Alene, attorneys for appellants. Mary Shea argued.

Witherspoon Kelley, Spokane, Washington, attorneys for respondent. Christopher Varallo argued.

_____

BEVAN, Justice.

This is an action for breach of an employment contract in which Thomas Lunneborg (Lunneborg) claimed he was entitled to $60,000 severance because he was terminated without cause. Lunneborg was hired to be Chief Operating Officer (COO) of My Fun Life Corporation (MFL) on April 16, 2014. Lunneborg was terminated on July 29, 2014, ostensibly for cause. Lunneborg brought this action seeking his severance pay pursuant to the employment contract. The district court, sitting as trier of fact, found MFL did not have cause to terminate Lunneborg. Therefore, Lunneborg was awarded $60,000 in damages, which was trebled to $180,000 under the Idaho Wage

1

Claims Act.  Lunneborg was also awarded attorney fees.  The court also pierced MFL's corporate veil and found that Lunneborg's judgment may be collected against MFL's sole shareholder, Dan Edwards (Edwards), and against Edwards' wife, Carrie Edwards (Carrie), personally.

MFL, Edwards, and Carrie appeal, contending that the trial court erred in three particulars, by: 1) failing to uphold Edwards' determination that Lunneborg was fired for cause; 2) piercing the corporate veil; and 3) abusing its discretion in the amount of attorney fees it awarded to Lunneborg. We affirm the judgment of the district court.

## I. FACTUAL AND PROCEDURAL BACKGROUND

During a court trial, the following salient facts were established.  MFL was a multi-level marketing company that sold memberships for access to discount travel accommodations. Edwards was the sole shareholder and director of MFL. Edwards' wife Carrie was not a shareholder of MFL, but she had previously served as COO of the corporation, and thereafter as its Executive Vice President.[1]  In early 2014, Edwards wanted to hire someone to take over the day-to-day operations at MFL. Edwards also wanted to hire someone who could develop nutritional products, which MFL members could purchase in addition to travel accommodations.

OxyFresh Corp. (OxyFresh) was a multi-level marketing company that sold nutritional products, among other goods.  Edwards knew both the owner of OxyFresh, Richard Brooke (Brooke), and its head naturopath, Dr. Todd Schlapfer (Schlapfer), who helped create nutritional products at OxyFresh. Lunneborg worked at OxyFresh in sales and product development for over twenty years and was Vice President of Logistics and Product Development in April 2014.  While working for OxyFresh, Lunneborg, together with Schlapfer, brought several nutritional products to market.  One of these products was a vitamin drink called "Life Shotz," in which Lunneborg held an ownership interest.

Schlapfer knew Edwards was looking for an executive level employee to run MFL, and he also knew Lunneborg had concerns about continuing his employment at OxyFresh. Unlike Schlapfer, Lunneborg had no background in science and, therefore, he could not develop nutritional products on his own.  However, Lunneborg had experience marketing, distributing, and bringing nutritional products to market.

Edwards was introduced to Lunneborg through Schlapfer. After several meetings with Lunneborg, Edwards offered him a position at MFL as its COO via a letter dated April 8, 2014.

[1] For ease of reference the Court will refer to MFL, Edwards and Carrie collectively as the "appellants."

Lunneborg accepted Edwards' offer of employment, and an employment contract between MFL and Lunneborg was created when Lunneborg signed the letter on April 16, 2014. In pertinent part, the employment contract stated: "Your employment with the Company will be at will; meaning that either you or the Company will be entitled to terminate your employment at any time and for any reason, with or without cause." The employment contract stated further: "In the event of termination of this employment agreement, without cause, except resignation, six months of salary will be paid on current payroll schedule." Lunneborg's first day as MFL's COO was May 21, 2014.

As part of the negotiations for Lunneborg to work at MFL, the parties agreed that Lunneborg could simultaneously serve as a consultant for OxyFresh for six months to make up for the difference between what Lunneborg was earning at OxyFresh in April 2014 and what he was initially being paid at MFL. Lunneborg also wanted to act as a consultant to help ease the impact of his transition from OxyFresh to MFL. Edwards was aware of Lunneborg's intention to consult for OxyFresh and did not object to this arrangement. Despite Lunneborg's intentions, Lunneborg and Brooke were unable to finalize a written agreement regarding the scope of Lunneborg's consulting services. Nevertheless, Lunneborg continued to work as a consultant for OxyFresh and received a monthly salary of $5,000 from May to July 2014.

While Lunneborg and Brooke were negotiating the terms of the consulting contract, Brooke contacted Edwards. Edwards contends that Brooke informed him that Lunneborg had a contractual obligation with OxyFresh that prohibited Lunneborg from developing any nutritional products at MFL. The trial court found that Edwards never verified through Lunneborg that he was under contract with OxyFresh. Instead, Edwards relied on what the court characterized as a "false rumor" and approached Lunneborg, telling him that he needed to resign from MFL. Edwards said once Lunneborg resigned he would form a new retail corporation and hire Lunneborg to run it. Edwards stated that if Lunneborg failed to agree, then he would be terminated. When Lunneborg asked why he had to resign before the new corporation was formed, Edwards responded that "he had a fiduciary duty to his shareholders and members." When Lunneborg asked what he would be terminated for, Edwards reiterated this same response. Lunneborg refused to resign from MFL.

On July 29, 2014, Edwards physically delivered a termination letter to Lunneborg. The termination letter cited two separate reasons for Lunneborg's termination:

1. The central purpose of your employment here was to bring health and nutritional products to market. You are unable to make any significant progress to that end, and whenever I have encouraged you to work on that goal, you have refused to

3

take action, citing roadblocks that you claim prevent the development of new products.

2. I have also learned that you have been negotiating a consulting agreement with your former employer that would expressly prohibit you from bringing other new products to market. This is in direct competition with your duties at MyFunLife and a serious breach of your obligation to us. We cannot continue to pay an employee who not only fails to perform the central functions of his position, but is motivated to continue in that failure by an outside consulting arrangement that requires continued inaction.

Edwards relied upon these grounds to terminate Lunneborg. Because Edwards felt he terminated Lunneborg for cause, Edwards refused to pay him the $60,000 in severance which Lunneborg sought pursuant to the employment contract.

On December 8, 2014, Lunneborg filed a complaint against MFL. The complaint alleged, among other things, that: (1) MFL breached its employment contract with Lunneborg by terminating him without cause and not paying him the $60,000 in severance; and (2) MFL violated the Idaho Wage Claims Act (Idaho Code section 45-601 *et. seq.*,[2]) which entitled Lunneborg to treble damages in the amount of $180,000. On January 5, 2015, MFL filed an answer and counterclaim. The answer denied Lunneborg's claims and asserted the affirmative defenses of failure of consideration and fraudulent inducement. The counterclaim alleged that Lunneborg breached his duty of good faith and fair dealing and that Lunneborg was unjustly enriched. On January 27, 2015, Lunneborg filed an answer to the counterclaim, which asserted various defenses to MFL's counterclaim.

On September 8, 2015, Lunneborg sought leave of the district court to amend his original complaint to add Edwards and Carrie as defendants. Lunneborg asserted that he could pierce MFL's corporate veil and reach the personal assets of both Edwards and Carrie to satisfy any potential judgment against MFL. Leave was granted without objection, and Lunneborg's first amended complaint was filed on December 21, 2015. On February 16, 2016, the appellants answered but did not plead any affirmative defenses or counterclaims to this amended complaint.

On June 22, 2016, MFL filed a notice of bankruptcy, informing the district court that MFL filed for Chapter 7 protection under the United States Bankruptcy Code. As a result, Lunneborg filed

---

[2] This Court has referred to these statutes as the "Idaho Wage Claims Act." *See Huber v. Lightforce USA, Inc.*, 159 Idaho 833, 367 P.3d 228 (2016). We will do likewise here.

4

a motion to reset the trial date, and the district court rescheduled the trial to begin on March 13, 2017.

On March 13, 2017, a three-day bench trial commenced. On April 17, 2017, the district court issued its memorandum decision. The court determined that Lunneborg was terminated without cause. As the finder of fact, the court did not believe the two reasons Edwards gave for Lunneborg's termination, and alternatively found that if Edwards believed in these reasons, such beliefs were unreasonable. The court further found that the reasons given by Edwards were a pretext, and that Lunneborg may have been terminated because he refused to replicate OxyFresh's product, Life Shotz, for MFL. When making these findings, the district court did not believe Edwards or Carrie were credible witnesses; thus, the court gave more weight to the testimony of Lunneborg and other witnesses than it gave to Edwards or Carrie. Because the court determined Lunneborg was terminated without cause, it found he was entitled to $60,000 severance pay pursuant to his employment agreement. This amount was trebled to $180,000 pursuant to the Idaho Wage Claims Act. The district court also pierced MFL's corporate veil and found Edwards and Carrie were jointly and severally liable to Lunneborg. On April 25, 2017, the court issued its final judgment.

On May 3, 2017, the appellants filed a motion to alter or amend the district court's judgment. The appellants argued that the court erred when it found Carrie's separate property (as a non-shareholder in MFL) could be subject to Lunneborg's judgment. On June 6, 2017, the court issued a decision denying the appellants' motion to alter or amend and the appellants filed their notice of appeal on the same day. On June 20, 2017, the court issued its amended final judgment, granting Lunneborg costs in the amount of $6,852.69, discretionary costs in the amount of $176.00, and attorney fees in the amount of $160,000.00. On July 11, 2017, the appellants filed an amended notice of appeal based on this amended final judgment.

## II. ISSUES ON APPEAL

1. Did the district court err when it found Lunneborg was terminated from MFL without cause?
2. Did the district court err when it pierced MFL's corporate veil?
3. Did the district court err when it pierced MFL's corporate veil to reach the personal assets of Carrie Edwards?

5

4. Did the district court abuse its discretion in awarding Lunneborg attorney fees in the amount of $160,000.00?[3]

5. Is Lunneborg entitled to attorney fees on appeal?

## III. STANDARD OF REVIEW

"The review of a trial court's decision after a court trial is limited to ascertaining 'whether the evidence supports the findings of fact, and whether the findings of fact support the conclusions of law.' " *Griffith v. Clear Lakes Trout Co.*, 143 Idaho 733, 737, 152 P.3d 604, 608 (2007) (quoting *Idaho Forest Indus., Inc. v. Hayden Lake Watershed Improvement Dist.*, 135 Idaho 316, 319, 17 P.3d 260, 263 (2000)). This Court will affirm a trial court's findings of fact unless those findings are clearly erroneous. *Id.*; I.R.C.P. 52(a)(7). Findings of fact that are supported by substantial and competent evidence are not clearly erroneous—even in the face of conflicting evidence in the record. *Kelly v. Wagner*, 161 Idaho 906, 910, 393 P.3d 566, 570 (2017). "Substantial and competent evidence is relevant evidence which a reasonable mind might accept to support a conclusion." *Id.* (quoting *Lamar Corp. v. City of Twin Falls*, 133 Idaho 36, 42–43, 981 P.2d 1146, 1152–53 (1999).) Finally, because of the trial court's special role to weigh conflicting evidence and judge the credibility of witnesses, "[t]his Court will 'liberally construe the trial court's findings of fact in favor of the judgment entered. . . .' " *Id.* (quoting *Oregon Mut. Ins. Co. v. Farm Bureau Mut. Ins. Co. of Idaho*, 148 Idaho 47, 50, 218 P.3d 391, 394 (2009)).

*Hull v. Giesler*, 163 Idaho 247, ___, 409 P.3d 827, 829–30 (2018).

We have recently held "that issues of alter ego and veil-piercing claims are equitable questions." *Wandering Trails, LLC v. Big Bite Excavation, Inc.*, 156 Idaho 586, 591, 329 P.3d 368, 373 (2014). "In these cases, the trial court is responsible for determining factual issues that exist with respect to this equitable remedy and for fashioning the equitable remedy." *Id.* Accordingly, the trial court's determination that MFL's corporate veil should be pierced is subject to an abuse of discretion standard of review. *See Climax, LLC v. Snake River Oncology of E. Idaho, PLLC*, 149 Idaho 791, 794, 241 P.3d 964, 967 (2010) (a trial court's decision to grant or withhold equitable remedies is reviewed for abuse of discretion). When this Court reviews an alleged abuse of discretion by a trial court the sequence of inquiry requires consideration of *four* essentials. Whether the trial court: (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific

---

[3] Although the appellants claim they are appealing the grant of costs by the district court, they only make arguments on the grant of attorney fees. Because the appellants have failed to make any argument on the grant of costs, we will only address the grant of attorney fees. *See Carney v. Heinson*, 133 Idaho 275, 283, 985 P.2d 1137, 1145 (1999) ("This Court will not consider issues cited on appeal that are not supported by propositions of law, authority or argument.") (internal quotation marks and citation omitted).

6

choices available to it; and (4) reached its decision by the exercise of reason. *See Hull*, 163 Idaho at ___, 409 P.3d at 830.

This discretionary standard has frequently been cited as a "multi-tiered inquiry," *e.g.*, *State v. Hedger*, 115 Idaho 598, 600, 768 P.2d 1331, 1333 (1989) or even as a "three prong" standard, *see Blackmore v. Re/Max Tri-Cities, LLC*, 149 Idaho 558, 563, 237 P.3d 655, 660 (2010), which judges and lawyers alike can likely recite by heart. It appears to have originated in *Assocs. Nw., Inc. v. Beets*, 112 Idaho 603, 605, 733 P.2d 824, 826 (Ct. App. 1987), based upon language taken from the Idaho Appellate Handbook, *Standards of Appellate Review in State and Federal Courts*, § 3.4, (Idaho Law Foundation, Inc., 1985). We take this occasion to clarify that even though this test has been enumerated in three subparts for over thirty years, it is actually a *four-part standard*, requiring trial courts to do the *four* things set forth above in exercising their discretion. By making this correction we are not altering the substance of the test; we simply take this opportunity to clarify what has previously been a compound second sentence -- which actually requires two separate things, that a trial judge act both 1) within the boundaries of her or his discretion; and 2) consistently with the legal standards applicable to the specific choices available to the judge.

## IV. ANALYSIS

### A. The district court had substantial and competent evidence to find Lunneborg was not terminated for cause.

The existence of "just cause" or "good cause" to terminate an employee under the terms of an employment contract is a factual determination. *See Rosecrans v. Intermountain Soap & Chem. Co., Inc.*, 100 Idaho 785, 787, 605 P.2d 963, 965 (1980) ("[W]here there exists a conflict with respect to the circumstances surrounding the employee's discharge, the existence of good cause is an issue for the trier of fact."); *see also C. R. Crowley, Inc. v. Soelberg*, 81 Idaho 480, 486, 346 P.2d 1063, 1066 (1959) (where there exists conflicting evidence regarding whether a party breached a contract, resolution of the issue is for the trier of fact). "Where good cause is required, the employer must show that the employee did something wrong that justified the termination." *Metcalf v. Intermountain Gas Co.*, 116 Idaho 622, 630, 778 P.2d 744, 752 (1989).

The appellants advocate that trial courts in Idaho must give deference to the decisions of the employer in disputes involving termination for cause, arguing that the trial court erred by substituting its judgment for that of the employer. They even go so far as to state that "the courts are

not authorized to second guess an employer," and that "[e]mployers in Idaho must feel confident . . . that if they conduct a reasonable investigation concerning the conduct of their employees and find cause to terminate, an Idaho court will not simply second guess that decision and *substitute its own judgment as some 'super personnel committee[4].'* " (emphasis added). This position misstates the role of the fact-finder in these types of cases.

While we recognize there are occasions pursuant to federal employment discrimination law to give deference to the decisions of the employer in employee termination cases, *e.g. Frogley v. Meridian Joint Sch. Dist. No. 2*, 155 Idaho 558, 567, 314 P.3d 613, 622 (2013) (applying federal employment law and quoting *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002) ("[C]ourts only require an employer honestly believed its reason for its actions, even if its reason is foolish or trivial or even baseless."), such circumstances do not abrogate the court's duty to require, as did the trial court here, that good cause be rooted in an objectively reasonable basis for the termination, based on facts supported by substantial evidence.

We thus hold that a better-reasoned approach is to adopt what the California Supreme Court called the "middle ground," *Cotran v. Rollins Hudig Hall Int'l, Inc.*, 948 P.2d 412, 418–19 (Cal. 1998), which combines "a balanced regard for the employee's interest in continuing employment with the employer's interest in efficient personnel decisions. . . ." *Id.* Pursuant to this standard, "the [fact-finder's] role is to assess the *objective reasonableness* of the employer's factual determination of misconduct." *Id.* at 419 (emphasis in original). The North Dakota Supreme Court relied upon *Cotran* and stated this standard succinctly in *Thompson v. Associated Potato Growers, Inc.*, 610

---

[4] The highlighted portion of the appellants' assertion that courts are not authorized to second guess an employer is very similar to a statement found in Corpus Juris Secundum. *See* 30 C.J.S. *Employer—Employee* § 78 (2018) ("A federal court. . . does not sit as a super-personnel department that oversees a company's general employment practices and guarantees to each employee a genial boss."). A full reading of that section, however, points out the misconception of the appellants' argument in this regard:

> *The employer is not the sole judge of what constitutes good cause*, which is not satisfied by the employer's mere dissatisfaction with the employee's performance, or the mere absence of bad faith or evil or fraudulent conduct by the employee. *Good cause is presented only if a discharge is objectively reasonable, in that a reasonable person would find the cause sufficient. . . .*
>
> The employer determines the facts in deciding whether good cause for discharge exists, in the absence of a contract provision to the contrary, and the *employer may act on its findings if they are supported by substantial evidence.*

*Id.* (emphasis added).

N.W.2d 53 (N.D. 2000). We hereby adopt the same objective, good faith standard, applicable to "good cause" terminations as follows:

> We conclude the objective standard exemplified by *Cotran* is the better approach for assessing an employer's decision about whether an employee actually committed the acts leading to discharge, and, if so, whether the act constituted cause for termination. We adopt the objective good-faith standard under which an employer is justified in terminating an employee for good cause for fair and honest reasons, regulated by good faith on the part of the employer, that are not trivial, arbitrary or capricious, unrelated to business needs or goals, or pretextual. A reasoned conclusion, in short, supported by substantial evidence gathered through an adequate investigation that includes notice of the claimed misconduct and a chance for the employee to respond.

*Id.* at 59 (internal citations and quotations omitted).

Here, the trial court applied the appropriate, objective standard, and found that good cause did *not* exist in this case because neither of the two reasons given in the termination letter was true, and neither of those reasons was supported by the evidence. The trial court also stated that even if Edwards "believed in the truth of those reasons, such belief was not reasonable." Such findings are the absolute essence of a trier of fact's purview when weighing "the evidence and judg[ing] the demeanor of the witnesses and tak[ing] into account [its] superior view of the entire situation." *Interest of Doe Children*, 163 Idaho at ____, 413 P.3d at 776–77; *see also Cox v. Cox*, 84 Idaho 513, 520, 373 P.2d 929, 933 (1962) (a reviewing court is not authorized to go behind a trial court's findings and "say whether they are contrary to the weight of the evidence, that function being wholly for the trial court.").

The district court found that Lunneborg was not terminated for cause because MFL was unable to show that Lunneborg "did something wrong." Indeed, the court found that Edwards was the party who "did something wrong," and that Lunneborg "fully and completely performed his duties as COO." These factual findings are supported in the record, albeit not without dispute by the appellants. Nevertheless, "[f]indings of fact that are supported by substantial and competent evidence are not clearly erroneous—even in the face of conflicting evidence in the record." *Hull*, 163 Idaho at ___, 409 P.3d at 830. As noted above, this Court's place in reviewing a trial court's findings of fact and conclusions of law is one of restraint. When findings of fact are supported by evidence "which a reasonable mind might accept to support a conclusion," *Kelly*, 161 Idaho at 910, 393 P.3d at 570, this Court must uphold those findings, even if they are hotly contested—as they are here.

9

Indeed, we must liberally construe the findings of fact in favor of the judgment, due to the trial court's unique position "to weigh conflicting evidence and testimony and to judge the credibility of witnesses. . . ." *Griffith*, 143 Idaho at 737, 152 P.3d at 608. Applying this deferential review to the court's findings here, we hold that the court did not make clearly erroneous factual findings, nor did its legal conclusions lead to an erroneous result.

The court found the following salient facts regarding Lunneborg's employment with MFL:

1) Plaintiff Lunneborg was hired by MFL to serve as its Chief Operating Officer (COO) for an indefinite period of time.
2) Lunneborg and MFL entered into an employment contract which stated that Lunneborg's position would be Chief Operating Officer.
3) Lunneborg was hired to help bring products, including nutritional products to market. This was not the central purpose of Lunneborg's employment with MFL.
4) The employment contract provided that if Lunneborg were terminated by MFL without cause, MFL would pay Lunneborg six months' salary as severance.
5) Lunneborg fully and completely performed his duties as COO during his short time with MFL.
6) MFL, through Edwards, terminated Lunneborg by written letter, alleging two grounds that were both incorrect.

These findings are supported by substantial and competent evidence. Indeed, the key question in the case, whether Edwards terminated Lunneborg for cause, is affirmed based upon the trial court's ability to receive evidence, consider the credibility and probative value of that evidence, and make reasoned findings based thereon. The trial court did so, and as such the court did not err.

The appellants point to several facts of significance to them, seeking to show that the factual findings made by the district court were clearly erroneous. For example, they argue that Lunneborg failed to perform his obligation to bring a new product to market and that Lunneborg had an inherent conflict of interest because he continued to work as a consultant for OxyFresh while at MFL. Therefore, appellants contend, the reasons given for Lunneborg's discharge in the termination letter constituted good cause to terminate Lunneborg. The appellants even advocate that if Edwards subjectively believed these reasons were sufficient to terminate Lunneborg, his decision is owed deference by the court.

Even so, the appellants also acknowledge in their opening brief that the evidence in this case "is in dispute," and that the trial court believed Lunneborg's "version of events over everyone

10

else's." In making these candid admissions, the appellants have recognized that the facts were disputed by both sides. The appellants' difficulty is that the trial court found, on multiple occasions, that Edwards' and Carrie's testimony lacked credibility. "It is within the province of the [fact-finder] to assign weight to conflicting evidence and credibility to testimony." *State v. Anderson*, 145 Idaho 99, 104, 175 P.3d 788, 793 (2008). Sitting as the arbiter of these contested facts, the trial court also found the reasons given for Lunneborg's termination did not constitute good cause based upon emails, text messages, direct testimony, and the application of logic to those facts. For example, the fact that Lunneborg did not bring a product to market within two months of being hired was an unachievable objective and was inconsistent with facts regarding a timeline for product development as contained in Edwards' very own notes. An additional example is that Lunneborg lacked any scientific background and the ability to develop products for human consumption without someone like Schlapfer, who was never a part of MFL. Moreover, Edwards had the final say as to any product which was to be brought forward and financed for development. Edwards had not come close to giving this final say in the two months Lunneborg served as COO. As to allegations of Lunneborg's alleged conflict of interest with OxyFresh, Edwards was fully aware that Lunneborg would continue to act as a consultant for OxyFresh at the time he was hired as MFL's COO. The fact that Edwards terminated Lunneborg for an alleged conflict of interest was, as the court found, based on a "false rumor" that Edwards never verified with Lunneborg.

These examples are not exhaustive, but simply highlight some of the facts which the trial court chose to rely upon in making both the factual and legal conclusion that Lunneborg was not terminated for cause. In making that determination, the court was not bound to simply accept Edwards' subjective reasons for the termination as contained in the letter. The court appropriately exercised its prerogative as the trier of fact to conclude that the reasons stated in the letter were a mere pretext for terminating Lunneborg when he refused to assist in duplicating OxyFresh's product, Life Shotz. The appellants are asking this Court to reweigh all of these facts to reach a result which favors their position. "[T]his Court does not reweigh evidence, but defer[s] to the trial court's unique ability to accurately weigh the evidence and judge the demeanor of the witnesses and take into account the trial court's 'superior view of the entire situation.' " *Interest of Doe Children*, 163 Idaho 367, ___, 413 P.3d 767, 776–77 (2018) (quoting *Doe v. Doe*, 148 Idaho 243, 246, 220 P.3d 1062, 1065 (2009)).

Thus, the trial court found that there was not adequate, reasonable support in the record for the appellants' reasons for terminating Lunneborg. There was substantial and competent evidence to support the court's findings. Thus, in reaching its conclusion that Lunneborg was terminated without cause, the court did not err.

**B. The court did not abuse its discretion when it found the corporate veil should be pierced.**

We recognize that "generally, every corporation will be regarded as a separate legal entity," and that the "powers of a court to disregard a corporate entity must be exercised cautiously." *Alpine Packing Co. v. H.H. Keim Co., Ltd.*, 121 Idaho 762, 763, 828 P.2d 325, 326 (Ct. App. 1991). "Unless otherwise provided in the articles of incorporation, a shareholder of a corporation is not personally liable for the acts or debts of the corporation except that he may become personally liable by reason of his own acts or conduct." I.C. § 30-29-622 (2015).[5] As a separate legal entity, a properly functioning corporation protects individual shareholders, directors and/or officers from liability and those protections should not be cast aside carelessly. Nevertheless, when warranted, "courts will pierce the corporate veil and look behind the form of [an] organization to determine [its] true character . . . and will disregard corporate form and consider substance rather than form." *O'Bryant v. City of Idaho Falls*, 78 Idaho 313, 325, 303 P.2d 672, 678 (1956); *see also Minich v. Gem State Developers, Inc.*, 99 Idaho 911, 917, 591 P.2d 1078, 1084 (1979) (the fact finder may disregard the corporate form, thereby making individuals liable for corporate debts or making corporate assets reachable to satisfy obligations of the individual).

As noted above, "issues of alter ego and veil-piercing claims are equitable questions." *Wandering Trails*, 156 Idaho at 594, 329 P.3d at 376. "When one party is seeking recovery in equity, 'the trial court is vested with discretion in determining the 'equities' between the parties.' " *Schmidt v. Huston*, 2016 WL 7387384, at *4 (Idaho Dec. 21, 2016) (quoting *Griggs v. Safeco Ins. Co. of Am.*, 103 Idaho 790, 792, 654 P.2d 378, 380 (1982)). As a general principle, the trial court is granted broad discretion in fashioning equitable relief. *Rowe v. Burrup*, 95 Idaho 747, 750, 518 P.2d 1386,

---

[5] Section 30-29-622 was enacted in 2015. S.L. 2015, ch. 243, § 61. This section replaced the former section 30-1-622, which (with the exception of code section references) is identical to the current section 30-29-622. This Court has held "when the Idaho legislature repeals a statute and then enacts in its place a new statute that includes the same language that was in the repealed statute. . . . [w]e presume that the legislature intended that such language in the new statute have the same meaning and construction that we placed on that language in the repealed statute." *Barrios v. Zing LLC*, 162 Idaho 566, ___, 401 P.3d 144, 148 (2017). Therefore, the enactment of section 30-29-622 does not conflict with this Court's prior veil-piercing law.

1389 (1974). Thus, a trial court's exercise in applying equitable principles requires "recourse to principles of justice to correct or supplement the law as applied to particular circumstances, [including] the judicial prevention of hardship that would otherwise ensue from the literal interpretation of a fair-minded application of a trial court's discretion." *Black's Law Dictionary*, 656 (10th ed. 2014).

On appeal we must review whether the four-prong standard for discretionary review has been met. That is, whether the trial judge:

> (1) Correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason.

Here, the trial court recognized that whether the corporate veil should be pierced presents an equitable/discretionary decision. While the trial court did not expressly cite to the discretionary standard in its memorandum decision regarding piercing the corporate veil, a court is not required to state such standard expressly if the record clearly shows that the court correctly perceived the issue. *State v. Dunlap*, 155 Idaho 345, 363–64, 313 P.3d 1, 19–20 (2013). The trial court recognized that "[a]chieving an equitable result is the paramount goal of the doctrine of piercing the corporate veil," and that the process is "heavily fact-specific with the overriding objective being for the [c]ourt to reach an equitable result." The court's task required consideration of multiple factors, which it described in detail. By acknowledging its balancing responsibility, the court recognized that there is not a bright-line rule in equitable cases, and that a trial court is free to assess the equities and "weigh the various equitable considerations and determine whether, in its discretion, [a party] is entitled to equitable [relief.]" *Tudor Eng'g Co. v. Mouw*, 109 Idaho 573, 575, 709 P.2d 146, 148 (1985). Thus, the trial court recognized its discretion in its weighing process.

The second element of discretion is equally supported by the record. The trial court noted the equitable options available to it and acted within the outer boundaries of its discretion as to piercing the corporate veil.[6] The more-pointed question is whether the court met the third prong of its discretion and acted consistently with Idaho's legal standards to pierce the corporate veil. We conclude that the court did.

"Piercing the corporate veil imposes personal liability on otherwise protected corporate officers, directors, and shareholders for a company's wrongful acts allowing the finder of fact to

---

[6] Whether the trial court violated this legal prescript as to Carrie will be discussed in **subsection C** below.

ignore the corporate form." *Wandering Trails*, 156 Idaho at 594, 329 P.3d at 376. As an equitable decision, "the trial court is responsible for determining factual issues that exist with respect to this equitable remedy and for fashioning the equitable remedy." *Id.* at 591, 329 P.3d at 373.

> To prove that a company is the alter ego of a member of the company, a claimant must demonstrate (1) a unity of interest and ownership to a degree that the separate personalities of the [company] and individual no longer exist and (2) if the acts are treated as acts of the [company] an inequitable result would follow.

*Id.* at 594, 329 P.3d at 376 (quotation marks omitted) (quoting *Vanderford Co. v. Knudson*, 144 Idaho 547, 556–57, 165 P.3d 261, 270–71 (2007)).

In making determinations regarding this two-fold inquiry, we have not adopted an extensive list of factors relative to disregarding the corporate form and piercing the corporate veil. However, in *Wandering Trails*, we did note that "[u]nder the theory of piercing the corporate veil, factors to consider include the level of control that the shareholder exercises over the corporation, the lack of corporate formalities, the failure to operate corporations separately, keeping separate books, and the decision-making process of the entity." 156 Idaho at 594, 329 P.3d at 376. The Idaho Court of Appeals has also provided a list of factors for consideration. *See Hutchison v. Anderson*, 130 Idaho 936, 940, 950 P.2d 1275, 1279 (Ct. App. 1997) (noting four non-exclusive factors to review when considering whether the corporate veil should be pierced).

Other courts have considered a vast array of factors in determining whether to pierce the corporate veil. *See* 114 Am.Jur.3d. *Proof of Facts* 403, § 10 (2010) (listing twenty different factors that courts have considered in determining whether to pierce the corporate veil). *See also Jones & Trevor Mktg., Inc. v. Lowry*, 284 P.3d 630, 636 (Utah 2012) (adopting eight factors "as useful considerations to aid courts in determining whether to pierce the corporate veil."); *Automotive Finance Corp v. Joliet Motors, Inc.*, 761 F.Supp.2d 789, 793 (N.D. Ill. 2011) (citing *Fontana v. TLD Builders, Inc.*, 362 Ill.App.3d 491, 503, 840 N.E.2d 767, 778 (2005) (listing eleven non-dispositive factors for consideration)); *In re Phillips*, 139 P.3d 639, 644 (Colo. 2006) (*en banc*) (while courts may consider a variety of factors in determining whether a unity of interest exists, the court specified eight such factors for consideration).

We cite these authorities as persuasive considerations to guide courts' analyses in these circumstances, but we decline to adopt a more-detailed list of factors. These cases are driven by their factual intricacies and we conclude that adopting a formal list of non-exclusive factors is

14

unnecessary. We adopt the reasoning of the Utah Supreme Court which recently noted that such factors

> are merely helpful tools and not required elements. Indeed, "factors adopted as significant in a particular decision to disregard the corporate entity *should be treated as guidelines and not as a conclusive test*." 1 WILLIAM MEADE FLETCHER ET AL., FLETCHER CYCLOPEDIA OF CORPORATIONS § 41.30 (2006). Rather, "a careful review of the entire relationship between various corporate entities and their directors and officers" is necessary. *Id.* § 41.10. Thus, each alter ego case should be determined based on its individual facts by evaluating the entire relationship between the corporation and its shareholders.

*Lowry*, 284 P.3d at 636 (emphasis added).

The bottom line in Idaho is that "a claimant must demonstrate (1) a unity of interest and ownership to a degree that the separate personalities of the [company] and individual no longer exist and (2) if the acts are treated as acts of the [company] an inequitable result would follow." *Wandering Trails*, 156 Idaho at 594, 329 P.3d at 376. The trial court cited this standard and found that it was met in this case.

In reaching its conclusion, the court cited multiple cases listing the relevant factors for its consideration in weighing the equities among the parties. The court stated:

> Lunneborg need only prove one factor in order to pierce the corporate veil of MFL and hold Dan Edwards and Carrie Edwards personally liable. . . . As discussed below, nearly *all [of] these various factors have been met in light of the facts of the present case*. The acts of Dan Edwards and Carrie Edwards (and in some cases the inaction of Dan and Carrie Edwards) prove that the corporate veil must be pierced.

The appellants argue that the trial court misstated the law of piercing the corporate veil by making the statement noted above regarding proof of one factor alone being sufficient to pierce the corporate veil. They take the court's statement out of context and misapply the court's reasoning.

As noted, this Court has never expressly adopted a list of factors for consideration in these cases, and we decline to do so today. We further decline to state whether one factor alone is sufficient for a claimant to carry its burden in these factually-driven cases, although there is authority that establishing one factor in certain circumstances can be sufficient. *See Lowry*, 284 P.3d at 638 ("[I]t is possible that evidence of even one of the [listed] factors may be sufficient to . . . preclude summary judgment. . . . [However], the[se] factors are non-exclusive. Therefore, there is no specific formula for how many factors a party must establish. Rather, the court must evaluate the entire relationship between the corporation and its officers. . . .").

15

We hold that in making these equitable determinations, trial courts are free to consider the myriad of factors cited by the authorities catalogued herein, without resorting to a formulaic recitation of elements that must be proven as if the exercise were akin to a criminal case wherein the "elements" must be proven by the state beyond a reasonable doubt. These determinations are circumscribed in principles of "fairness" and "justice" and will be left to the discretion of trial courts to "weigh the various equitable considerations and determine whether, in [their] discretion, [a party] is entitled to equitable [relief.]" *Mouw*, 109 Idaho at 575, 709 P.2d at 148.

Weighed against this flexible standard, the trial court did not err in applying multiple factors to the Edwards' conduct and finding facts that demonstrated a unity of interest and ownership between Edwards, Carrie, and MFL to a degree that the separate personalities of MFL and the Edwards no longer existed. Nor did the court err in concluding that if the Edwards' acts were treated as solely the acts of MFL, an inequitable result would follow. These conclusions are supported by substantial evidence and were legally sound.

By way of example, as the trial court recognized, MFL did not observe any corporate formalities. In particular, MFL did not issue any stock certificates and it did not conduct regular corporate meetings. MFL's only corporate minutes were those from its initial meeting. MFL did not appoint corporate officers through any formal process and no resolutions were made authorizing Carrie to act as COO or Executive Vice President.

The court also noted that MFL did not pay any dividends, which is the customary way a distribution of money by a corporation is made to its shareholders, as authorized by the board of directors. Here, Carrie testified that her family, including the Edwards' children, received over $100,000.00 in commissions and shares of membership fees, and that Edwards and Carrie also received approximately $360,000.00 in shareholder distributions. The vast majority of these shareholder distributions were payments by MFL to Edwards and Carrie to pay their family's personal expenses. Payments were also made in significant amounts for car expenses for two motor vehicles titled in the Edwards' names. Approximately $2,000 per month was paid to the loans on these two vehicles by MFL. This evidence also supported the court's conclusion that the Edwards' financial activities created a unity of interest among the Edwards' closely held businesses and their personal accounts. Substantial evidence also showed that corporate credit cards were routinely used to purchase personal items and to pay for personal expenses.

16

The trial court also identified multiple transactions demonstrating the commingling of funds without proper accounting and reconciliation. As noted by the court, "the lines between [the Edwards'] personal assets and the assets of all their businesses, including MFL, were heavily blurred." The Edwards owned at least four companies other than MFL: Ink Drop Signs, TraffiCorp, Hawaiian Sun Tanning Salon, and an LLC to hold real property. Carrie testified that the various corporations "gave advance monies to each other," and that "one or two times a month, depending on cash flow" they would transfer money from one corporation to another. Carrie testified this was done to "help out" their various businesses. While Carrie testified that "this was all kept track in their records, and it all got paid back," the court found that Carrie's statement was not credible and not supported by the evidence. Rather, the trial court found that

> Dan and Carrie Edwards produced no written documents to evidence the many transfers of funds between themselves and their companies. There was documentary evidence in the form of a spreadsheet produced at trial to support Carrie Edwards' claim that they kept track of their money transfers from one corporation to another. However, there were no loan documents, no contracts, no bank statements, and no notes evidencing these transfers. There [were] no corporate minutes to document these transfers. And even the spreadsheet contradicts Carrie Edwards' testimony that those transfers were paid back to MFL.

According to the court, contrary to the Edwards' assertions, there was "no evidence to show that MFL was ever paid back or made whole by TraffiCorp or Ink Drop Signs." While Carrie testified that these amounts were paid back to MFL, the appellants produced no documentary evidence to support their claims. The court reviewed the evidence and concluded that both Edwards and his wife Carrie "used their companies as conduits through which to conduct their personal financial ventures." The court's written memorandum decision confirms that it conducted "a careful review of the entire relationship between various corporate entities and their directors and officers," *Lowry*, 284 P.3d at 636, and appropriately found a unity of interest existed between the Edwards and MFL.

The trial court also went on to find that the second factor, whether piercing MFL's corporate veil would also prevent an inequitable result, was also met. The court recognized that this factor "requires something less than an affirmative showing of fraud but something more than the mere prospect of an unsatisfied judgment." (citing *Wachovia Securities, LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 756 (7th Cir. 2012)). Applying this legal standard the court found that an inequitable result would occur beyond simply the prospect of an unsatisfied judgment. As the court noted, this is because "[i]nstead of paying the severance to Lunneborg as provided in his

17

employment contract, the Edwards drained MFL of all income and assets by diverting those assets and income to themselves and to TraffiCorp and by continuing to use the MFL credit cards for personal purchases. The Edwards were very successful in this diversion to the extent that they left MFL with $5.11 of assets by June 22, 2016." The court held that to allow the Edwards to escape personal liability would be to sanction an injustice and create an inequitable result. The court's exercise of discretion in reaching this conclusion comports with Idaho law regulating its decision-making process.

Finally, we must consider whether the court abused its discretion by failing to exercise reason in reaching its conclusions. The role of this Court in determining if the district court reached its decision by an exercise of reason is to review the process the district court engaged in to make its decision. *Sheridan v. St. Luke's Reg'l Med. Ctr.*, 135 Idaho 775, 782, 25 P.3d 88, 95 (2001). As noted, the court cited to Idaho law and the law of other jurisdictions, the court made extensive factual findings as it viewed the evidence, and it reasoned through the equities of the overall state of affairs in reaching its conclusion. The appellants have failed to show that the trial court did not exercise reason in this process. Therefore, the trial court did not abuse its discretion and its determination to pierce the corporate veil is affirmed.

### C. The court did not err in reaching Carrie Edwards' personal assets by piercing the corporate veil.

The next question presented is whether the court appropriately found that MFL's corporate veil could be pierced not only as to Edwards, but also as to Carrie personally. As noted, Carrie once served as both Executive Vice President and COO of MFL. She was also intimately involved in the day-to-day financial operations of MFL and the Edwards' other four business entities. She is the one who took direct action in managing these business' affairs and she testified, although the court did not find her credible, in explaining the corporate financial spread sheet that was admitted at trial. Carrie was clearly not a passive bystander in the operation of MFL or in its day-to-day operations. She also played a role in the initial hiring of Lunneborg, including attending meetings during his recruiting period and directly communicating with Lunneborg in the days prior to Lunneborg's termination.

This Court has held, albeit in passing, that "piercing the corporate veil imposes personal liability on otherwise *protected corporate officers, directors, and shareholders* for a company's wrongful acts allowing the finder of fact to ignore the corporate form." *Wandering Trails*, 156 Idaho

18

at 594, 329 P.3d at 376 (emphasis added).  However, whether a non-shareholder can be liable for the debts of a corporation is a matter of first impression for this Court. *See Swenson v. Bushman Investment Properties, Ltd.*, 870 F. Supp. 2d 1049, 1058–59 (D. Idaho 2012) (stating Idaho courts "have not squarely addressed whether an individual must be [a] shareholder to be potentially liable for corporate debts.").

Appellants argue that the trial court failed to act consistently with applicable legal standards by imposing liability on Carrie, a non-shareholder officer of MFL. Specifically, the appellants characterize the trial court's holding as piercing the corporate veil to reach the personal and separate property of an innocent spouse who was not an owner of the corporation.  However, the appellants' assertions fail to acknowledge the extent of Carrie's involvement with MFL, and the trial court's thorough analysis on the issue. Having determined that there was no controlling Idaho law, the trial court looked at persuasive authority from other jurisdictions, where there is no unified answer among courts as to whether a non-shareholder can be liable for the debts of a corporation.

Recently, the Illinois Court of Appeals performed an extensive review and found that the majority of jurisdictions addressing this question allow veil-piercing against non-shareholders. *Buckley v. Abuzir*, 8 N.E.3d 1166, 1171–77 (Ill. App. 2014) (*citing  Fontana*, 840 N.E.2d 767, 778 (Ill. App. 2005) (Illinois law does not preclude piercing the corporate veil and imposing personal liability for the corporation's debts because of status as a non-shareholder); *Freeman v. Complex Computing Co., Inc.*, 119 F.3d 1044, 1051 (2d Cir. 1997) (under New York law if an individual exercises sufficient control over the corporation they may be held liable despite the fact they are a non-shareholder); *Angelo Tomasso, Inc. v. Armor Const. & Paving, Inc.*, 447 A.2d 406, 412 (Conn. 1982) (under Connecticut law, "stock ownership, while important, is not a prerequisite to piercing the corporate veil but is merely one factor to be considered. . . . It is clear that the key factor in any decision to disregard the separate corporate entity is the element of control or influence exercised by the individual sought to be held liable over corporate affairs.")).

Still, other jurisdictions have held that an individual must be a shareholder as a prerequisite to claims of piercing the corporate veil. *See Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1351 (11th Cir. 2011) (under Florida law a plaintiff was not permitted to pierce the corporate veil against a non-shareholder director); *Thibodeau v. Cole*, 740 A.2d 40, 42 (Me. 1999) (in Maine, only shareholders may be held liable when piercing the corporate veil); *Allred v. Exceptional*

19

*Landscapes, Inc*., 743 S.E.2d 48, 53–54 (N.C. Ct. App. 2013) (North Carolina courts refuse to pierce the veil to reach a non-shareholder).

Having reviewed both lines of cases, we adopt the majority rule in Idaho. Stock ownership, while important, is not a necessary prerequisite to pierce the corporate veil—it is merely one factor to consider. As we noted above, there are several factors a court of equity may consider when determining whether to pierce the corporate veil. Similarly, in these circumstances, when a claimant seeks to hold a non-shareholder liable for corporate debts, the court may look to a range of evidence to consider whether fairness dictates allowing recovery against a non-shareholder-officer, with the primary consideration being the element of control or influence exercised by that person in the affairs of the corporation.

Here, the trial court acknowledged the split among jurisdictions, and ultimately found the majority approach, i.e. to permit piercing the corporate veil to reach a non-shareholder, to be persuasive. The court found that shareholder status was still a factor to be considered, but that it was not a dispositive factor. Thereafter, the court determined that despite the fact that Carrie was a non-shareholder, she had extensive financial control of MFL, and was an integral part of the corporation:

> Carrie Edwards was directly involved in the day-to-day management of MFL; Dan and Carrie Edwards failed to keep adequate corporate records to document actions, including issuance of stock, distributing dividends, or holding an annual meeting; Dan and Carrie Edwards, as an officer-in-fact of MFL extensively commingled personal and MFL corporate funds, and corporate funds of MFL with other corporate entities owned by Dan and Carrie Edwards; Dan and Carrie Edwards caused many transfers of assets between themselves (or their other closely-held corporations) and MFL's bank accounts, without consideration, written contracts, indicia of debt, or official corporate action; Dan and Carrie Edwards used MFL credit cards and bank accounts for a multitude of personal expenses, totaling hundreds of thousands of dollars; the financial records of MFL reveal several examples of funds deposited into MFL accounts from other entities owned and controlled by Dan and Carrie Edwards; Corporate funds belonging to MFL were regularly commingled with the funds belonging to other closely held corporations of Dan and Carrie Edwards, as well as their personal funds, to such an extent that the funds and accounts are indistinguishable; Dan and Carrie Edwards regularly treated the assets of MFL as their own personal assets.

The trial court ultimately concluded that Carrie exercised ample control over MFL to warrant piercing the corporate veil to reach her separate property. Specifically, the court found that Carrie's actions in moving the money around were "the most important and most significant disregard of MFL's corporate entity." The court's findings are supported by substantial evidence and its holding

20

is consistent with other jurisdictions that have permitted piercing the corporate veil when an individual exercises sufficient control over the corporation, despite their status as a non-shareholder. As a result, the trial court applied the appropriate standard set forth herein and did not abuse its discretion in piercing the corporate veil to reach Carrie's separate property.

**D. The court did not abuse its discretion in awarding attorney fees.**

The appellants lastly argue that the trial court abused its discretion in the amount of attorney fees it awarded to Lunneborg. They argue that the court's granting $160,000.00 in attorney fees for a three-day trial was unreasonable. "In those instances where attorney fees can properly be awarded, the award rests in the sound discretion of the court and the burden is on the disputing party to show an abuse of discretion in the award." *Bums v. Cty. of Boundary*, 120 Idaho 623, 625, 818 P.2d 327, 329 (Ct. App. 1990).

In making this determination, this Court conducts the same four-part inquiry set forth above: Whether the trial court: (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason.

The trial court issued a sixteen-page memorandum decision justifying the amount of fees it awarded. Before beginning its analysis, the court rightly perceived the granting of fees was a discretionary matter. The court then applied the correct legal standard and, acting within the boundaries of its discretion, found Lunneborg was entitled to attorney fees pursuant to the Idaho Wage Claims Act (Idaho Code section 45-601 *et*. *seq*.). The Act provides any judgment awarded to a plaintiff under the Act "may include all costs and attorney's fees reasonably incurred in connection with the proceedings." I.C. § 45-615. The court also found Lunneborg was entitled to attorney fees pursuant to Idaho Code section 12-120(3). This section allows an award of fees to the prevailing party in actions arising out of contracts relating to services or commercial transactions. After concluding that Lunneborg was entitled to fees, the court cited to Idaho Rule of Civil Procedure 54(e)(3) to calculate the amount of attorney fees.

The court then analyzed each one of the twelve factors in the Rule. In doing so, the court reduced the amount of fees incurred by Lunneborg from $223,564.50 to $160,000.00. A reason given for settling on the lesser, but significant amount was because 1,042 hours of attorney fees were incurred by Lunneborg. The court explicitly found this amount of time was "shocking," reducing the total amount requested by over $60,000. The court further reduced the hourly rate of one of the

attorneys who worked on the case. The court also factored-in the appellants' discovery abuses, the delay due to MFL's bankruptcy, and the fact Lunneborg had to defend against counter-claims that the appellants eventually abandoned.

Given the trial court's reasoned analysis of the twelve Rule 54(e)(3) factors, the amount of fees the court calculated was reached by understanding the legal principles involved and exercising reason. Therefore, the court did not abuse its discretion in the amount of attorney fees it awarded to Lunneborg.

### E.  Lunneborg is entitled to attorney fees on appeal.

Lunneborg seeks attorney fees on appeal pursuant to Idaho Code section 12-120(3) and 12-121. Section 12-120(3) states:

> In any civil action to recover on an open account, account stated, note, bill, negotiable instrument, guaranty, or *contract relating to* the purchase or sale of goods, wares, merchandise, or *services* and in any *commercial transaction* unless otherwise provided by law, the prevailing party shall be allowed a reasonable attorney's fee to be set by the court, to be taxed and collected as costs.

(Emphasis added). A commercial transaction is "all transactions except transactions for personal or household purposes." I.C. § 12-1203(3). "[I]n order for a transaction to be commercial, each party to the transaction must enter the transaction for a commercial purpose." *Carrillo v. Boise Tire Co.*, 152 Idaho 741, 756, 274 P.3d 1256, 1271 (2012). Because this case arises from a contract for services (employment) *and* a commercial transaction, Lunneborg is entitled to attorney fees on appeal pursuant to Idaho Code section 12-120(3). Given that fees are awarded pursuant to Idaho Code section 12-120(3), we do not address whether fees should be awarded pursuant to section 12-121.

### V.  CONCLUSION

For the reasons set forth above, the district court's judgment is affirmed.  Attorney fees on appeal are awarded to Lunneborg. Pursuant to Idaho Appellate Rule 40, Lunneborg is also awarded costs on appeal as the prevailing party.

Chief Justice BURDICK, Justices HORTON, BRODY and JUSTICE *pro tem* MEYER, CONCUR.