# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 47246

SCOTT R. CARTER and AMELIA J. CARTER,
husband and wife; and SCOTT CARTER, INC.,
dba CARTER DENTAL,

    Plaintiffs-Appellants,

v.

GATEWAY PARKS, LLC,

    Defendant-Respondent.

)
)
)
)
)
)
)
)
)
)
)

Boise, September 2020 Term

Opinion filed: November 2, 2020

Melanie Gagnepain, Clerk

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Michael J. Reardon, District Judge.

The judgment of the district court is <u>affirmed</u>.

Evans Keane, LLP, Boise for Appellants. Jed Manwaring argued.

Borton-Lakey Law Offices, Meridian, for Respondent. Joseph Borton argued.

---

MOELLER, Justice

Scott Carter, Amelia Carter, and Scott Carter, Inc., dba Carter Dental (collectively "Carter") appeal from the Ada County district court's grant of summary judgment in favor of Gateway Parks, LLC (hereinafter "Gateway"). This case concerns Carter's second attempt to litigate the propriety of the use of his investment funds in a proposed snowpark in Eagle, Idaho. Carter sued Gateway for common law fraud in the inducement and under the "general fraud" provisions of the Uniform Securities Act of 2004 (Idaho Code section 30-14-501, et seq). Carter alleged that Gateway had misrepresented and failed to disclose its use of Carter's investment funds in Gateway with an intent to defraud him. The district court granted summary judgment in favor of Gateway, finding Carter's claims were (1) barred by the statute of limitations and *res judicata*, and (2) because Carter could not establish the essential elements of a fraud claim. The district court also awarded attorney fees and costs to Gateway. For the reasons set forth below, we affirm the district court's rulings.

1

## I. FACTUAL AND PROCEDURAL BACKGROUND

Scott Carter and Ryan Neptune were boyhood friends, having known each other since junior high school. Neptune is a snowboarder and in the business of operating snowboard/ski terrain parks ("snowparks"). Carter is a dentist practicing in Boise. Neptune is the owner of Neptune Industries, Inc. Neptune operated two snowparks in Michigan. Neptune began to discuss with investors in the snowboard/ski industry the concept of operating snowparks within metropolitan areas in order to bring recreational facilities closer to consumers.

In March 2013, Neptune first discussed his business idea with Carter. Neptune envisioned opening snowparks in multiple locations over the next several years, including Eagle, Idaho, but he needed capital from outside sources. Carter later approached Neptune about investing in his venture. Neptune explained his plan to Carter: each snowpark would operate under its own limited liability company ("LLC"), which would operate under a parent company called "Gateway." Neptune had yet to form Gateway, which is why Neptune needed investments from non-bank sources. In late March 2013, Neptune formed the first two LLCs. At that time, Carter reasserted his interest in investing to Neptune.

In April 2013, Neptune shared a "DropBox" folder with Carter. DropBox is a "cloud" storage site, which enabled Neptune to store files online for access via the internet. Neptune gave Carter access to the DropBox folder in April of 2013. Neptune showed Carter how to access DropBox from both a computer and a phone. Neptune's DropBox folder contained information about the soon-to-be formed Gateway and the other LLCs operating snowparks. Also included in DropBox were files containing Neptune's personal finances, tax returns, expenditures, company data, insurance information, receipts, checking account registers, investor agreements, and operating agreements. Neptune utilized DropBox as a central filing database because it could be accessed by his investors from any location. Neptune regularly updated it, and Carter would receive a notification of the new updates any time that he logged on to DropBox.

Carter accompanied Neptune to the City of Eagle to investigate a potential snowpark location there. Both met with the city's Parks and Recreation director. Carter also attended Neptune's presentation to the City of Eagle about the formation of a snowpark.

On June 6, 2013, Neptune sent a text to Carter inquiring about whether he was still interested in investing. Neptune specified that he needed funds for due diligence, travel, and legal expenses for Gateway. Carter and Neptune worked out an agreement. The initial agreement

contained an option for Gateway to either pay Carter back as a loan with interest, or to give Carter shares in Gateway as an equity investment. On June 10, and June 12, 2013, Carter issued checks to Neptune in the amounts of $30,000 and $70,000 respectively.[1] Neptune used the funds for legal fees and other associated expenses for Gateway. Soon after, the parties agreed that Carter's funds would be considered an equity investment in Gateway, not a loan. Neptune emailed Carter a draft agreement for investor returns as Neptune sought out more investors. Neptune kept Carter and the other investors abreast of Gateway's business and financial status through emails and the DropBox account.

On July 23, 2013, Neptune contacted Carter to determine whether he would be interested in investing more money in Gateway for trademarks, insurance, and company-related travel. Carter agreed and on August 3, and August 6, 2013, Carter issued checks to Neptune for $10,000 and $15,000, respectively.

On August 21, 2013, Neptune formed Gateway as an LLC. Neptune Industries was identified as the managing member. On November 24, 2013, Carter called for an investor meeting to review the operating agreement, investor agreement, and to give a status report on Gateway. Carter was out of town, but he gave Neptune permission to go forward with the meeting without him. The meeting was held on December 3, 2013. Carter and Neptune later met privately and Neptune brought Carter up to speed on everything.

In January 2014, Carter agreed to loan Gateway $35,000 to purchase a piece of property in Eagle, Idaho for a snowpark. However, at the end of January 2014, Carter and Neptune agreed to convert the $35,000 into an additional capital contribution in Gateway. On January 30, 2014, Carter issued another check for $40,000 so Gateway could purchase a snow groomer. In February 2014, Neptune uploaded all bank account transactions and all bank account statements from all of his business entities, including Neptune Industries and Gateway, to DropBox.

Throughout the spring of 2014, Carter continued to be involved in the operations of Gateway, including meeting with a bank to discuss loan options for Gateway, being appointed as a board member, requesting that he and his wife be listed as part owners of Gateway, and voting as a board member during a meeting held on July 30, 2014. By this time, Carter's capital contributions in Gateway had reached $200,000. However, in April 2014, Carter became increasingly concerned with his own financial situation. In August 2014, Carter asked Neptune

---

[1] Neptune deposited the money into Neptune Industries' bank account because Gateway had not yet been formed.

to be paid back principal and interest. This is the first time he had made such a request. In September 2014, Carter asked Neptune for an agreement to "collateralize the debt." Carter took the position that his $200,000 was not an investment, but a loan in which Gateway would pay him back with 10% interest and Carter would also receive capital shares in Gateway. Neptune disagreed and advised Carter that his best option would be to find someone to buy his shares in Gateway.

On March 2, 2015, Carter filed suit against Neptune and Neptune Industries (hereinafter "the first lawsuit") for breach of contract, or in the alternative, unjust enrichment, seeking repayment of the investment funds plus interest.[2] Just prior to trial in the first lawsuit, Carter claims Neptune produced bank statements from Neptune and Neptune Industries via discovery that showed the fraudulent use of his investment funds for Neptune's personal gain. Carter further alleges that this was the first time he saw the statements, although they had been previously uploaded to the DropBox account. At trial, to further Carter's unjust enrichment claim on this issue, he cross-examined Neptune extensively about Neptune Industries' expenditures of his investment funds. Specifically, Carter asked about Neptune Industries' expenditures made at restaurants, on business credit cards, to Neptune personally, for legal fees, to CPAs, to other snowpark LLCs, to Neptune's home mortgage, and to employees.

After a five-day bench trial in July and August of 2016, the district court ruled in favor of Neptune.[3] The district court held that the funds Carter advanced to Neptune were capital contributions, not loans to be repaid with interest. The district court entered findings of fact and conclusions of law and specifically found that Neptune and Neptune Industries' expenditures were for valid business purposes and that Carter had access to the DropBox account that contained all of the pertinent transactions, including those involving Gateway:

> [Neptune] shared a Dropbox folder with Carter through which he provided a substantial amount of information about the soon-to-be-formed Gateway and the individual entities operating snowparks. Neptune included his personal financials, tax returns, company data, insurance information, receipts, checking account registers, investor agreements, operating agreements and other documents. He utilized Dropbox as a central filing base that could be accessed from any location. Neptune regularly updated documents on Dropbox. Any time Carter logged onto

---

[2] Steven A. Hippler, district judge, presided over the first trial.

[3] Many of the aforementioned background facts were taken from the district court's findings of fact from the first lawsuit, which is part of the clerk's record on appeal.

4

Dropbox, which he regularly did, he would have received notification of updates that had been made.[4]

. . . .

Neptune constantly kept Carter and the other investors updated on the status of Gateway through emails regarding its business and financials and through Dropbox. He regularly downloaded the transactions from all the business accounts, including Gateway, Eagle Superparks, Rockford Superparks, Planet Snowtools, and Neptune Industries, and made them available on Dropbox.

. . . .

This Court does not find Carter credible. In April of 2013, Neptune specifically instructed Carter how to access tabs on spreadsheets using Google Docs and how to use Google Docs on his phone. Indeed, such instructions would be readily available through an internet search had Carter truly been unable to figure out how to use the program. More importantly, the documentary evidence – namely Carter's own communications – reveals that Carter regularly reviewed the documents that Neptune provided.

. . . .

*There is no evidence that Defendants received any personal benefit from the funds advanced.* All of the funds were properly accounted for as capital contributions to Gateway in exchange for ownership interest in the company. They were used to purchase capital assets and real property and were also used for operating expenses such as legal fees associated with company formation, insurance, and due diligence.

(Emphasis added). After considering a post-trial motion to alter or amend the judgment by Carter, the district court further clarified:

Finally, Plaintiffs seeks [sic] judgment in their favor for $165,000 on their unjust enrichment claim, arguing that the evidence was uncontroverted that these advances were made payable to Ryan Neptune personally, deposited in Neptune Industries' bank account and used for Defendants' own expenses rather than for Gateway. While the advances were made payable to Mr. Neptune and deposited in Neptune Industries' bank account, *this Court found no evidence that Defendants received any personal benefit from the funds advanced. All of the funds were properly accounted for as capital contributions to Gateway in exchange for an ownership interest in the company.* Neptune credibly testified that the funds were used to purchase capital assets, real property, and used for operating expenses such as legal fees associated with the company formation, insurance, and due diligence – all legitimate Gateway expenses. . . . For example, the mortgage payment on the Neptunes' property was a business expense because it was made pursuant to a lease agreement between the Neptunes and Neptune Industries for Gateway's use of a shop on the Neptunes' property for equipment

---

[4] Decker Rolph, another investor in Gateway, testified at trial during the first lawsuit that he had access to the Dropbox account, which included the expenditures and bank statements of Gateway.

5

storage. Likewise, the various charges for food were per-diem expenses for traveling Gateway employees.

(Emphasis added). Carter did not appeal from the district court's final judgment on any of his claims in the first lawsuit, or assert any error as to the findings and conclusions.

On May 14, 2018, Carter filed a second complaint, this time against Gateway only, for fraud in the inducement and violations of the Idaho Uniform Securities Act of 2004 (hereinafter "the Securities Act").[5] He alleged that Gateway had misrepresented and omitted to disclose the misuse of Carter's investment funds.

On March 21, 2019, Gateway filed a motion for summary judgment seeking to dismiss Carter's new complaint on three theories. First, Gateway asserted that Carter's complaint was barred by the statute of limitations because Carter had the ability to access Gateway's financial documents and discover where the investment money was going more than three years before he filed his second complaint. Second, in the alternative, Carter could not show a genuine issue of material fact as to all the elements of fraud, specifically the elements of a false statement, justifiable reliance, and injury. Third, Gateway argued that *res judicata* barred relitigation because the parties were the same in this lawsuit as in the first lawsuit, the matter of whether the investment money had been appropriately used was fully litigated in the first lawsuit, and the first lawsuit ended in a final judgment on the merits.

Carter opposed Gateway's motion for summary judgment, arguing he did not know of the misuse of funds until Gateway disclosed the bank statements on May 17, 2016, which is within the statute of limitations for both fraud in the inducement (two years) and general fraud under the Securities Act (three years). Furthermore, Carter argued that viewing the facts in the light most favorable to him, he established the elements of fraud. Finally, he asserted *res judicata* does not bar this suit because Gateway was not a party to the first lawsuit and the issue of the misuse and nondisclosure of Carter's investments had not been previously litigated.

The district court issued a memorandum decision and order granting Gateway's motion for summary judgment on the basis that (1) Carter's claims were barred under the applicable statute of limitations, (2) Carter could not show a genuine issue of material fact as to the elements of fraud, and (3) Carter's claims were barred by *res judicata*. The district court entered a judgment dismissing Carter's claims after which he timely appealed to this Court.

---

[5] Matthew J. Reardon, district judge, presided over Carter's second lawsuit, which is the subject of this appeal.

Gateway later filed a motion for costs and attorney fees. Gateway requested $19,939.39 in costs, and $58,250 in attorney fees pursuant to Idaho Code sections 12-120(3) and 12-121. Carter opposed Gateway's request. The district court held that the case arose from a commercial transaction under Idaho Code section 12-120(3) and granted Gateway's attorney fees request on that basis. However, the court denied Gateway's request for costs, specifically their fraud expert costs, because none of the experts ever testified and the court did not consider their expert opinion during summary judgment proceedings. Carter timely amended his appeal to include the district court's attorney fee award.

## II. STANDARD OF REVIEW

"This Court exercises *de novo* review of a grant of summary judgment and the 'standard of review is the same as the standard used by the trial court in ruling on the motion for summary judgment.' " *AED, Inc. v. KDC Invest, LLC,* 155 Idaho 159, 163, 307 P.3d 176, 180 (2013) (quoting *Stonebrook Const., LLC v. Chase Home Fin., LLC,* 152 Idaho 927, 929, 277 P.3d 374, 376 (2012)). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." I.R.C.P. 56(a). "This Court liberally construes the record in favor of the party opposing the motion for summary judgment and draws any reasonable inferences and conclusions in that party's favor." *Robinson v. Bateman-Hall, Inc.,* 139 Idaho 207, 209, 76 P.3d 951, 953, (2003).

## III. ANALYSIS

### A. The District Court did not err in granting summary judgment to Gateway because *res judicata* bars Carter's claims against Gateway.

Carter contends the district court erred when it determined *res judicata* barred his claims because (1) Gateway was not a party to the first lawsuit and (2) the issue of fraud was not previously litigated. We will address both arguments.

*Res judicata* generally bars relitigation between the same parties or their privies in the same cause of action when there has been a judgment on the merits in a prior proceeding. *D.A.R., Inc. v. Sheffer*, 134 Idaho 141, 144, 997 P.2d 602, 605 (2000).

> "*Res judicata* serves three fundamental purposes: (1) it preserves the acceptability of judicial dispute resolution against the corrosive disrespect that would follow if the same matter were twice litigated to inconsistent results; (2) it serves the public interest in protecting the courts against the burdens of repetitious litigation; and

(3) it advances the private interest in repose from the harassment of repetitive claims."

*Ticor Title Co. v. Stanion*, 144 Idaho 119, 123, 157 P.3d 613, 617 (2007). *Res judicata* encompasses claim preclusion (true *res judicata*) and issue preclusion, which is also known as collateral estoppel. *Id.* Although *res judicata* includes claim preclusion and issue preclusion, this Court has previously explained that each requires its own, separate test:

> Claim preclusion bars a subsequent action between the same parties upon the same claim or upon claims 'relating to the same cause of action . . . which might have been made.' Issue preclusion protects litigants from litigating an identical issue with the same party or its privy. *Separate tests are used to determine whether claim preclusion or issue preclusion applies*.

*Id.* (emphasis added) (internal citations omitted). Because this Court exercises free review when determining whether *res judicata* bars relitigation of an issue, and because *res judicata* encompasses both claim and issue preclusion, this Court can address both.

### 1. *Claim preclusion bars Carter's claims.*

In order for claim preclusion to bar subsequent litigation, a litigant must show that the current case and the previous case involve the same parties, the same claim, and the first case ended in a final judgment. *Ticor*, 144 Idaho at 125, 157 P.3d at 618.

#### (a) The first lawsuit and this lawsuit involve parties in privity with each other.

As noted, for claim preclusion to apply, both proceedings must involve the same parties or their privies. *Id.* at 124, 157 P.3d at 617. Carter initially contends that claim preclusion does not bar this lawsuit because Gateway was not a party to the first lawsuit. In response to that argument, Gateway asserts "the requirement of same party or its privy applies to the party *against whom* the doctrine of [res] judicata is applied." (citing *Union Pacific Land Resources Corp. v. Shoshone Cnty. Assessor*, 140 Idaho 528, 534, 96 P.3d 629, 635 (2004)) (emphasis in original). Therefore, Gateway maintains the doctrine only applies against Carter and it is met because Carter was a party to both lawsuits; it does not matter that Gateway was not explicitly a party to the first lawsuit.

Gateway's assertion conflates the doctrines of claim preclusion and issue preclusion. Issue preclusion requires a party to show, "the party against whom the issue is asserted was a party or in privity with a party to the prior litigation," along with four other factors as detailed further below. *Union Pacific Land Resources Corp.*, 140 Idaho at 534, 96 P.3d at 635. In

contrast, the first element of claim preclusion requires a showing that both proceedings involved the same parties or their privies – the doctrine is not applied unilaterally – meaning the asserter must show prior and current proceedings involved both parties. *Ticor*, 144 Idaho at 124, 157 P.3d at 618. Because Gateway was not a party to the first suit, we examine whether Gateway was in privity with Neptune or Neptune Industries to satisfy the first element of claim preclusion.

"To be privies, a person not a party to the former action must 'derive[] his interest from one who was a party to it, that is, . . . he [must be] in privity with a party to that judgment.' " *Id.* (quoting *Foster v. Cty. of St. Anthony*, 122 Idaho 883, 888, 841 P.2d 413, 418 (1992)). Generally, " 'one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been a made a party by service of process.' " *Richards v. Jefferson Cnty., Alabama*, 517 U.S. 793, 798 (1996) (quoting *Hansberry v. Lee*, 311 U.S. 32, 40 (1940)). A " 'judgment or decree among parties to a lawsuit resolves issues as among them, but it does not conclude the rights of strangers to those proceedings.' " *Id.* (quoting *Martin v. Wilks*, 490 U.S. 755, 762 (1989)). However, an exception exists when there is privity between a party in the second case and a party who is bound by an earlier judgment. *Id.* The United States Supreme Court has recognized an important exception to this general rule " 'when, in certain limited circumstances, a person, although not a party, has his interests adequately represented by someone with the same interests who is a party.' " *Wilks*, 490 U.S. at 762, n. 2 (citing *Hansberry*, 311 U.S. at 41-42). Idaho has also recognized the exception that a party may be bound by a prior judgment even when that party was not a party in the suit when their interests were adequately represented. *Kite v. Eckley*, 48 Idaho 454, 459, 282 P. 868, 869 (1929); *Foster v. Cty. of St. Anthony*, 122 Idaho 883, 888, 841 P.2d 413, 418.

The United States Supreme Court set forth six categories of non-party relationships which are sufficient to justify a finding of preclusion: (1) the nonparty "agrees to be bound by the determination of issues in an action between others"; (2) "pre-existing 'substantive legal relationship[s]' [exist] between the person to be bound and a party to the judgment"; (3) the "nonparty may be bound by a judgment because she was 'adequately represented by someone with the same interests who [wa]s a party' to the suit"; (4) the nonparty " 'assumed control' over the litigation in which that judgment was rendered"; (5) the nonparty is the "proxy" or "agent" of a party to the prior litigation; and, (6) "a special statutory scheme may 'expressly foreclos[e] successive litigation by nonlitigants . . . if the scheme is otherwise consistent with due process.' "

9

*Taylor v. Sturgell*, 553 U.S. 880, 893-895 (2008) (internal citations omitted). The second and third categories of the *Taylor* framework apply to parent and subsidiary defendants. Additionally, although no Idaho cases specifically address privity between subsidiary and parent companies, the Ninth Circuit has held that privity applies to parent and subsidiary defendants. *See Lake at Las Vegas Investors Grp., Inc. v. Pacific Malibu Dev. Corp.,* 933 F.2d 724, 728 (9th Cir. 1991) (holding that "wholly-owned subsidiary and partnership in which that subsidiary is the general partner may invoke the two dismissals of the subsidiary's parent and claim res judicata."), *cert. denied,* 503 U.S. 920 (1992); *In re Gottheiner*, 703 F.2d 1136, 1139-40 (9th Cir. 1983) (holding collateral estoppel barred second suit where defendant in prior suit was wholly owned by defendant in subsequent suit).

Here, Gateway was not a named party to the first lawsuit; yet, it derives its interest from Neptune Industries and Ryan Neptune. Gateway shared the same interests as its parent company Neptune Industries and its owner Ryan Neptune who were both parties to the first lawsuit. Therefore, Gateway is in privity with those parties because Ryan Neptune owns Neptune Industries, which is the managing member and majority owner of Gateway. Accordingly, the preclusive effect of the judgment in favor of Neptune and Neptune Industries in the first trial equally applies to Gateway in this case.

Finally, Carter's attorney suggested at oral argument that he was somehow barred from adding Gateway as a party by the judge in the first case. However, nothing in the record supports the assertion that he was either procedurally barred or somehow prevented by the district court from adding Gateway as a party in the first case. In the first lawsuit, Carter initially brought suit against only Neptune. Neptune moved to dismiss the complaint for failure to join Neptune Industries and Gateway as indispensable parties. Carter simultaneously moved to amend his complaint to add Neptune Industries, but not Gateway. Neptune objected to Carter's proposed amendment – only because it did not include Gateway. The district court denied Neptune's motion to dismiss for failure to join Gateway, finding it was not a necessary party and it granted Carter's motion to amend his complaint to add only Neptune Industries. Thus, Carter is judicially estopped from now pivoting 180° and arguing that the district court in the first case somehow wrongfully prevented him from adding Gateway as a party.

### (b) Carter's claims in this lawsuit are repackaged arguments from the first lawsuit.

10

Claim preclusion not only applies to the same claims previously brought, but "also as to 'every matter which might and should have been litigated in the first suit.' " *Ticor*, 144 Idaho at 126, 157 P.3d at 620 (quoting *Magic Valley Radiology, P.A. v. Kolouch*, 123 Idaho 434, 437, 849 P.2d 107, 110 (1993)). It " 'extinguishes all claims arising out of the same transaction or series of transactions out of which the cause of action arose.' " *Id.* (quoting *Diamond v. Farmers Grp., Inc.,* 119 Idaho 146, 150, 804 P.2d 319, 323 (1990)). This Court has held this concept is broad and that it " 'may apply even where there is not a substantial overlap between the theories advanced in support of a claim, or in the evidence relating to those theories.' " *Id.* " 'A cause of action can be barred by a prior adjudication even though the theory of liability and supporting evidence differ from the cause of action actually litigated in the prior suit.' " *Taylor v. Riley*, 157 Idaho 323, 332, 336 P.3d 256, 265 (2014) (quoting *Andrus v. Nicholson*, 145 Idaho, 774, 777, 186 P.3d 630, 633 (2008)).

Carter asserts that the claims are not the same because fraud was not a cause of action specifically alleged in the first lawsuit. If we were to accept Carter's assertion as correct, it leads to the reasonable question of why Carter did not attempt to include Neptune and Neptune Industries as parties in the second case since the fraud claims were somehow different. Indeed, according to Carter, Neptune and Neptune Industries fraudulently spent the investment funds before Gateway was even formed.

However, we reject Carter's assertion that these are different claims because we do not read the same claim requirement to be so narrow. Instead, we focus on the transaction or series of transactions out of which the cause of action arose, rather than the label placed on a specific cause of action by a party. The evidence underlying Carter's fraud claim in the current case is substantially the same evidence underlying his unjust enrichment claim in the former. Here, if Carter wished to pursue a separate fraud claim, Carter could and should have brought it in the first suit. The evidence underlying the new fraud claim concerns not only Gateway, but also Neptune and Neptune Industries' use of Carter's investments. Neptune, who was both the president of Neptune Industries and the manager of Gateway, was extensively cross-examined about such matters in the first trial.

Likewise, Carter's claim under the "general fraud" provision of the Securities Act should have been brought in the first lawsuit. The general fraud statute of the Securities Act provides:

It is unlawful for a person, in connection with the offer, sale, or purchase of a security, directly or indirectly:

(1) To employ a device, scheme, or artifice to defraud;

(2) To make an untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(3) To engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person; or

(4) To divert investor money to the personal use of the issuer, offeror or seller, or to pay prior investors without specifically disclosing that use before receiving the investor's money.

I.C. § 30-14-501. These four subsections essentially mirror the allegations Carter raised in the first lawsuit in support of his unjust enrichment claim. Carter now attempts to apply each section of the Securities Act to argue that Gateway's use of his investment funds was a violation of the Act. The evidence and legal theory Carter relies on for the alleged Securities Act violations in the current case are substantially the same as the evidence and legal theory underlying his unjust enrichment claim in the former. Additionally, the evidence concerns the same parties: Neptune, Neptune Industries, and its subsidiary, Gateway.

Carter's new fraud and Security Act violation claims are essentially just a rebranded version of his unjust enrichment claim from the first case. The district court properly found Carter's claims in the first lawsuit and his claims here to be the same because they arise out of the same series of transactions and they should have been litigated in the first lawsuit.

### (c) The first lawsuit ended in a final judgment on the merits of a similar claim that "might and should have been litigated" in the first lawsuit.

The third element of claim preclusion does not require resolution on the precise point or question in the present suit that was resolved in the first one. *Ticor*, 144 Idaho at 126, 157 P.3d at 620. Rather, it requires:

[I]n an action between the same parties upon the same claim or demand, the former adjudication concludes parties and privies not only as to every matter offered and received to sustain or defeat the claim but also as to *every matter which might and should have been litigated* in the first suit.

*Farmers Nat'l Bank v. Shirey*, 126 Idaho 63, 70, 878 P.2d 762, 769 (1994) (quoting *Joyce v. Murphy Land & Irrigation Co.,* 35 Idaho 549, 553, 208 P. 241, 242-43 (1922)) (emphasis added).

12

The gravamen of Carter's second lawsuit boils down to whether Gateway fraudulently used Carter's investments for its own purposes. However, this very issue was determined in the first lawsuit. Carter contends that it was not determined because he sued Neptune and Neptune Industries for breach of oral contract and unjust enrichment, not fraud. While this is true, Carter's unjust enrichment claim alleged that Neptune and Neptune Industries "have been unjustly enriched by using [Carter's] funds *for their beneficial business interests. . . .*" (Emphasis added). Moreover, Carter's attorney cross-examined Neptune during the first lawsuit on the expenditures of Carter's funds – the same expenditures he alleges constitute fraud in the second lawsuit. The district court in the first lawsuit found that all of Carter's funds were properly accounted for, and used to appropriately purchase capital assets, real property, and for operating expenses of Gateway. Even if the precise question of fraud was not resolved in the first lawsuit, it could have been—and should have been—resolved had Carter properly raised the issue. *Farmers Nat'l Bank*, 126 Idaho at 70, 878 P.2d at 769.

It is clear from the record that the first trial ended in a final judgment on the merits on the propriety of Gateway's use of Carter's investment funds. Therefore, because all three elements of claim preclusion have been met, *res judicata* bars Carter's second lawsuit against Gateway. Accordingly, we conclude that the district court did not err in granting Gateway's motion because it was entitled to summary judgment as a matter of law.

### 2. *Issue preclusion also bars Carter's claims.*

As previously noted, issue preclusion concerns different elements than claim preclusion. To successfully assert issue preclusion as a bar to relitigation of a claim, one must show:

> (1) the party against whom the earlier decision was asserted had a full and fair opportunity to litigate the issue decided in the earlier case; (2) the issue decided in the prior litigation was identical to the issue presented in the present action; (3) the issue sought to be precluded was actually decided in the prior litigation; (4) there was a final judgment on the merits in the prior litigation; and (5) the party against whom the issue is asserted was a party or in privity with a party to the litigation.

*Ticor*, 144 Idaho at 124, 157 P.3d at 618.

Here, similar to claim preclusion, issue preclusion also bars Carter's second lawsuit. First, Carter had a full and fair opportunity to litigate the use of his investment funds and, in fact, did previously litigate that issue. After a five-day trial in the first case, the district court found that Neptune Industries and Neptune were not unjustly enriched by Carter's investments and all

13

the funds were properly spent. Second, although Carter attempts to repackage the issue differently in this lawsuit, it is practically identical to the issue presented in the first lawsuit. Indeed, a second trial would involve the same witnesses and the same evidence. Third, the district court actually decided the issue in the first lawsuit and entered relevant findings of fact and conclusions of law, concluding: "All of the funds were properly accounted for as capital contributions to Gateway in exchange for ownership interest in the company. They were used to purchase capital assets and real property and were also used for operating expenses such as legal fees associated with company formation, insurance, and due diligence." Fourth, the district court's ruling in the first lawsuit constitutes a final judgment on the merits because the precise issue Cater raises here was resolved through findings of fact, conclusions of law, and a judgment. Finally, Carter was not only a party to the prior lawsuit, but actually brought both cases.

Inasmuch as Gateway has met the five elements of issue preclusion, the district court properly barred Carter's attempt to relitigate the expenditures of his investment money by granting summary judgment to Gateway. Therefore, because we affirm the district court's decision on *res judicata* grounds, we need not address the other bases upon which the court granted summary judgment in this case, i.e., the statute of limitations and failure to establish the elements of fraud.

**B. The district court's award of attorney fees below was warranted and reasonable.**

Carter contends on appeal that the district court erred in awarding attorney fees and costs to Gateway under Idaho Code section 12-120(3) because the basis of the lawsuit did not involve a contract or a commercial transaction. He further claims that even if the district court correctly determined the lawsuit involved a commercial transaction, it erred in determining that the fees were reasonable.

The question of whether a district court correctly determined that a case is based on a commercial transaction for attorney fees purposes under Idaho Code section 12-120(3) is a question of law over which this Court exercises free review. *Garner v. Povey*, 151 Idaho 462, 469, 259 P.3d 608, 615 (2011). Under section 12-120(3), a court is required to award attorney fees to the prevailing party in a civil action to recover "in any commercial transaction." I.C. § 12-120(3). A "commercial transaction" is defined as: "all transactions except transactions for personal or household purposes." *Id.* A commercial transaction can be characterized as one in

which the purpose for entering into the transaction was to generate income. *Stevens v. Eyer*, 161 Idaho 407, 412, 387 P.3d 75, 80 (2016).

Here, we agree with the district court's analysis that this was clearly a commercial transaction. It was intended to generate income for Carter, regardless of whether he characterized it as a loan or an investment. Moreover, Carter explicitly asserted in his complaint that he was entitled to attorney fees and costs under Idaho Code section 12-120(3), which only applies to a commercial transaction. We have previously held that "[a]llegations in the complaint that the parties entered into a commercial transaction and that the complaining party is entitled to recover based upon that transaction, are sufficient to trigger the application of I.C. § 12-120(3)." *Garner*, 151 Idaho at 470, 259 P.3d at 616. Accordingly, Carter is now estopped from asserting otherwise.

Next, we turn to Carter's assertion that the district court erred in awarding the full amount of attorney fees requested by Gateway. This Court reviews the amount of attorney fees awarded under an abuse of discretion standard, with the party appealing the award of statutory attorney fees bearing the burden of demonstrating the district court's clear abuse of that discretion. *Berkshire Invest., LLC v. Taylor*, 153 Idaho 73, 80, 278 P.3d 943, 950 (2012). To determine whether the district court abused its discretion, this Court applies a four-prong test: whether the trial court "(1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Lunneborg v. My Fun Life,* 163 Idaho 856, 867, 421 P.3d 187, 198 (2018).

In its analysis, the district court correctly perceived that the granting of fees was a discretionary matter. The court then applied the correct legal standard, and examined Idaho Rule of Civil Procedure 54(e)(3) to calculate the amount of fees. The court then considered each of the factors in Idaho Rule of Civil Procedure 54(e)(3). In doing so, it determined that Gateway's request of $58,250 in attorney fees was reasonable because of "the nature of the litigation, the amount involved in the controversy, and the length of time utilized in preparation for the various proceedings in this case. . . ."

Given its careful analysis, we conclude that the district court correctly perceived the award of attorney fees as a matter of discretion, it acted within the boundaries of its discretion, it applied the correct legal standards, and it reached its decision by the exercise of reason.

15

Therefore, the district court did not abuse its discretion by awarding $58,250 in attorney fees to Gateway.

### C. Gateway is entitled to attorney fees and costs on appeal.

As the prevailing party in this appeal, Gateway requests attorney fees and costs on appeal under Idaho Code section 12-120(3). As we held above, the district court did not err in finding this was a commercial transaction. Additionally, Carter cannot now assert that this case does not involve a commercial transaction because he requested attorney fees under section 12-120(3) in his underlying complaint. Accordingly, Gateway is entitled to recover its attorney fees on appeal under section 12-120(3). Costs on appeal are also awarded to Gateway as a matter of course pursuant to Idaho Appellate Rule 40.

## IV. CONCLUSION

For the foregoing reasons, this Court affirms the district court's decision granting Gateway's motion for summary judgment and entering final judgment in its favor. We also affirm its award of attorney fees to Gateway. Costs and attorney fees on appeal are awarded to Gateway.

Chief Justice BURDICK, and Justices BRODY, BEVAN and STEGNER **CONCUR.**