# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 48898

BENNETT G. DAY, also known as BEN DAY, )
individually, and as TRUSTEE OF TRUST B )
OF THE DONALD M. DAY AND )    Boise, April 2023 Term
MARJORIE D. DAY FAMILY TRUST; )
JOHN F. DAY; DAN E. DAY; THE ERNEST )    Opinion filed: August 14, 2023
AND LOIS DAY LIVING TRUST; )
HOLCOMB ROAD HOLDINGS, LLC, an )    Melanie Gagnepain, Clerk
Idaho limited liability company; DONNA )
DAY JACOBS; and DAVID R. DAY, )
)
    Plaintiffs-Appellants-Cross Respondents, )
)
v. )
)
IDAHO TRANSPORTATION )
DEPARTMENT, )
)
    Defendant-Respondent-Cross Appellant. )

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Samuel A. Hoagland, District Judge.

The judgment of the district court is affirmed.

Parsons, Behle & Latimer, Boise, for Appellants-Cross Respondents. Jason Mau argued.

Raúl R. Labrador, Idaho Attorney General, Boise, and Holland & Hart, LLP, Boise, for Respondent-Cross Appellant Idaho Transportation Department. Mary York argued.

_____

MOELLER, Justice.

This appeal arises out of an inverse condemnation action and a breach of contract claim. It concerns access to real property near the Isaacs Canyon Interchange in Ada County. It is the Day family's second appeal to this Court. *See Day as Trustee of Trust B of Donald M. Day and Marjorie D. Day Fam. Trust v. Transp. Dep't*, 166 Idaho 293, 458 P.3d 162 (2020) ("*Day I*"). The Day family and Trust B of the Donald M. Day and Marjorie D. Day Family Trust are now appealing

1

the district court's decision to grant the Idaho Transportation Department's ("ITD") motion for involuntary dismissal pursuant to Idaho Rule of Civil Procedure 41(b)(2). ITD has cross-appealed, arguing that the district court erred in denying its request for attorney fees under Idaho Code section 12-120(3). For the reasons set forth below, we affirm the decisions of the district court.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Day Property and the 1967 Contract

In 1935, Ernest George Day and Emma N. Day purchased a "quarter section less the right-of-way"[1] along the then-existing Highway 30 near Isaacs Canyon in Ada County. This property (the "Day Property") is located near what is now the Isaacs Canyon Interchange east of the City of Boise. After Earnest George Day's death in 1953, the Day Property was held in Emma's name and that of her three sons: Donald M. Day, Robert L. Day, and Ernest E. Day.

In 1961, the Days learned that access to their property via public highways would be affected when the state highway converted to a controlled-access federal interstate highway, then known as Interstate 80 ("I-80").[2] Emma and her three sons entered into a preliminary agreement with the Idaho Department of Highways ("IDH") that allowed IDH to take possession of approximately nine acres of the Day Property for construction of the interstate (the "1961 Agreement"). IDH is the predecessor agency to ITD.

A few years later, on October 23, 1967, the Days entered into a right-of-way contract (the "1967 Contract") with IDH in furtherance of the 1961 Agreement. The 1967 Contract included an agreement for IDH to provide access to a future frontage road from I-80 to the Day Property. The parties executed a warranty deed in accordance with the 1967 Contract, which included access to a future frontage road. However, the plain language of the 1967 Contract lacked language requiring either party to build the frontage road, and it failed to set forth a specific location for the future road and stock drive. The 1967 Contract only specified where access would be available to the Day Property.

After the execution of the 1967 Contract, IDH purchased a 50-foot public right-of-way "on which the Days were able to reasonably access" their Property. This access road was an unimproved right of way that allowed for a single point of access to the Day Property on its

---

[1] A "quarter section" is "[a] piece of land containing 160 acres [or one-quarter of a square mile], laid off by a north-south or east-west line; one quarter of a section of land, formerly the amount usually granted to a homesteader." *Section*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[2] This highway is now known as Interstate 84.

northeast corner. The route was described by the district court as a "jeep trail" and "fairly flat and direct route, upon which the Days had vehicular access to their Property." In 1975, Donald Day purchased an additional, adjoining parcel, which increased the area of the Day Property to about 300 acres. Multiple inter-familial ownership transfers of the Day Property occurred in the 1980s and 1990s. At the time this litigation began, title to the Day Property was vested in Trust B of the Donald M. Day and Marjorie D. Day Family Trust, John F. Day, Dan E. Day, Donna Day Jacobs,[3] David R. Day, and Holcomb Road Holdings, LLC.

**B. Isaacs Canyon Interchange Project**

In the 1990s, the State began construction on the Isaacs Canyon Interchange near the Day Property. The Interchange was substantially completed on December 5, 1997. At trial, the parties stipulated this was the date for valuation of any taking. The Interchange Project eliminated a portion of the original 50-foot right of way that provided access to the Day Property under the 1967 Contract. Because of this, ITD provided replacement access easements to the Day Property. These replacement access easements were located southwest of the Interstate.

On December 12, 1997, Ben Day informed ITD that the family was dissatisfied with the replacement easements and did not think they afforded the Days equivalent access to what they had prior to the construction of the Interchange. Their main complaint was that the replacement access traversed steep and impassible terrain. In order to establish public access, the Days informed ITD of their desire to construct a roadway on the easements that would be approved by the Ada County Highway District ("ACHD"). Between 1997 and 2000, the Days worked with ITD staff, including Steve Parry, the deputy attorney general for ITD, to resolve access issues on the property. The Days, Donna specifically, were very active in communicating with ITD and Parry regarding their concerns about property access, including concerns over the steep grade along the easements and their desire to construct a public road that would meet ACHD standards. The Days also reached out to then-Attorney General Al Lance for assistance, putting additional pressure on ITD to resolve the issues. As a well-known family in the community, the Days "used their many connections in an effort to resolve their issues with accessing their Property."

---

[3] The record refers at times to "Donna Day," Donna Jacobs," or "Donna Day Jacobs." To avoid confusion, this opinion will refer to her as "Donna."

**C. ITD's July and September 2000 Letters**

On June 7, 2000, Parry wrote an internal memorandum to ITD staff delineating the Days' concerns that 1) the terrain of the easements was too steep for ACHD to approve the construction of a public road, and 2) the approach at Eisenman Road "is at a right angle" and does not meet ACHD standards. Parry outlined two possible courses of action that the Days could pursue: taking the matter to the Transportation Board or filing suit based on inverse condemnation and breach of the 1967 Contract. Shortly after Parry wrote that memorandum, the Days hired A.J. Bohner (now deceased) as legal counsel to represent them in their dealings with ITD.

Bohner wrote to Parry to inform him he was representing the Days in this matter and requested a response updating him on ITD's position regarding the Days' access within 10 days. Once Bohner was hired, Donna ceased personally communicating with Parry and ITD. The Days' decision to retain counsel, and Bohner's reputation for filing "premature litigation" against ITD, caused Parry heightened concern about the possibility of the Days filing a lawsuit. Bohner sent another letter to Parry on July 18, 2000, pressing for a response to his earlier letter. Parry testified that Bohner was persistent with his communications and would send written correspondence almost weekly, requesting a response. On July 19, 2000, Parry wrote a letter to Bohner to request additional time to formulate a proposal to solve the access issues. Parry wrote in part:

> **I would request that you provide the Department an extension until September 5, 2000 or shortly thereafter to be able to give you a firm proposal on a solution to this access issue. . . .**

> I truly believe the Department is taking this matter seriously and will have some type of proposal to provide substitute access to the property**. I will also represent to you that the Department will not assert any type of statute of limitations defense if an agreement on new access cannot be reached.**

> If an agreement can be reached on a new access easement, we will need to discuss obtaining an easement from the Day family to reconnect the new right-of-way through the BLM property to the existing frontage road stock driveway. The new easement created a small gap in the right-of-way and there may be property owners to the east of the Day property, which have historically used the stock driveway.

> Thank you in advance for your patience with the Department in trying to resolve this issue.

(Emphasis added).

4

There is no evidence of further communication between the parties about the substance of Parry's letter.[4] Bohner told Parry he was "pleased" that ITD was working on a solution and expected a response from Parry in September. Parry updated Bohner in August, stating a public road could be constructed within the existing easement and that ITD was trying to determine whether it needed to widen the easement or seek more property from the underlying property owner. On September 18, 2000, Parry provided Bohner with ITD's proposed solution, including a memorandum from ITD's designers depicting a road that could be built on the current easements. Parry stated in the letter that it was his understanding that ACHD would approve ITD's proposal. Parry also asked the Days to let him know if any additional needs arose on this issue. His letter concluded:

> If there is something more to be done on this issue, please let me know. With ACHD's concurrence in the conceptual design (enclosed documents), I think the Department has fulfilled its duty of replacing in kind, the access the Day Family lost when the new freeway interchange was constructed.

There were no further communications between the Days and ITD for the next eight years.

**D. The Days' Actions Following Parry's Letter**

On January 31, 2001, Bohner wrote to ACHD about his correspondence with Parry and ITD, attaching the September 2000 letter and requesting direction from ACHD on the proposed roadway design. About a month later, a planning and development coordinator for ACHD sent Bohner a letter stating he could not definitively say whether the proposed road would meet ACHD standards due to the limited information provided by Bohner. ACHD asserted that more detailed plans would be required to determine whether the design would meet its standards. However, the Days did not submit any further plans for the proposed roadway to ACHD for its consideration. Instead, Donna began negotiating with neighbors regarding alternative routes for access to the Day Property. Of note, and contrary to her later testimony, the district court found that Donna did not discuss the agreement to toll the statute of limitations with her neighbors while trying to find alternative access.

---

[4] While Parry's letter has been consistently referred to as a "waiver," it is more appropriately understood to mean an agreement to toll the statute of limitations. This is its legal effect. However, the terminology of "waiver" and "toll" have been used interchangeably since *Day I*. As this Court explained previously, a perpetual or indefinite waiver of the statute of limitations would be void as against public policy. *Day I*, 166 Idaho at 302, 458 P.3d at 171. Instead, "the waiver is valid only for a reasonable time" and "is a question of fact." *Id.* But, as shown on remand, the district court found that Parry's intent "was to merely *toll* the statute of limitations until ITD presented a firm and final proposal to the Days in September." (Emphasis added).

5

From 2001 to 2005, the Days' focus turned to selling their property. There is no indication that the statute of limitations agreement was discussed or even mentioned in their discussions with potential buyers. The Days sold the property to Edmonds Groves Land Holdings Inc. ("Groves") in 2005, with the purchase price secured by a mortgage held by the Day Family. Testimony and evidence introduced at trial established that, at the time of the sale, the representative for Groves was fully aware of the existing access to the Day Property, was able to obtain title insurance, and had no reason to believe that ITD was required to build a road to the Day Property. There was apparently no reference to a tolling of the statute of limitations when the Days sold the Property to Groves.

During the spring of 2008, Groves entered negotiations to sell the Day Property to a third party. On April 23, 2008, Groves, Donna, and potential new buyers met with a right of way supervisor from ITD because the potential buyers had questions regarding property access. Following the meeting, ITD sent the potential buyers a letter allowing the release of legal descriptions and survey work regarding the easements. There is no evidence that Groves or the Days requested ITD take any action regarding access to the Day Property in 2008. Groves and Donna also communicated with ACHD in the Spring of 2008 regarding ACHD's plan to connect Lake Hazel Road to Eisenman Road.

Groves later defaulted in its mortgage agreement with the Days during the recession in December of 2008. As a result, ownership of the Day Property reverted to the Day Family by way of deed in lieu of foreclosure.

**E. Communications between the Days and ITD from 2009-2016**

After the Days reacquired the property, they had difficulty obtaining title insurance because of concerns that "the access easement was owned by ITD and [the Days] did not have any statement that the easement was for the benefit of the Days." Donna reached out to Parry for assistance with the title insurance issue in 2009. Parry introduced Donna to an ITD employee with experience in title work, and then prepared documentation to assist the Days in confirming that the easement was for the Days' benefit and the benefit of other adjacent landowners. However, no actions were taken to modify the existing access.

Parry retired in 2010. Prior to his retirement, he prepared an internal memorandum about the history of ITD's work on the Day Property to inform any staff that might be involved in the issue with the Days in the future. In 2011, ITD provided the Days with an "Assignment and

6

Assumption of Highway Easement Deed," which assigned a "floating easement"—an easement ITD had previously acquired across BLM land—to the Days in an attempt to resolve their title issues. The Days rejected this offer because, as Donna testified, it did not solve all the issues the title company identified—it only addressed the grantee issue and did not connect to Eisenman Road. Communication again ceased between the Days and ITD for all of 2012.

The Days began working with ITD again in 2013, seeking help in finding a location for the approach to the easement from Eisenman Road. On February 6, 2014, ITD applied to ACHD for a temporary access point known as the "Green Gate" along Eisenman Road. ACHD denied ITD's application. ITD appealed to the ACHD commissioners for review, but then requested that the appeal be deferred. ITD ultimately withdrew its appeal after ACHD advised ITD that it would not approve the location of the approach because ACHD had no basis for judging the appropriateness of the application and the approach was not tied to a proposed development application. In 2014 and 2015, Donna began working with an ITD development services manager to get a neighboring landowner to widen the easement, with the goal of aligning the easement with the "Green Gate." In 2015, ITD offered the Days $560,000 to build the road themselves, which the Days rejected. An employee of ACHD emailed ITD and Donna in May of 2016 stating that:

> ACHD will not accept a public street between the off ramp and the future Lake Hazel/Eisenman intersection which is approximately 1800-feet from the current gate. There are existing accesses in this area today. ACHD is not commenting on these accesses nor stating that ACHD will restrict or alter them in any way.

Over the course of these communications, the Days presented information on the type of road that could be built and their desire to construct a road that would meet ACHD standards.

### F. The Days File Suit Against ITD

The Days filed this action against ITD on November 1, 2016, asserting three causes of action: 1) inverse condemnation, 2) breach of contract, and 3) breach of an implied covenant of good faith and fair dealing. After the Days moved for partial summary judgment, ITD brought a cross-motion for partial summary judgment and filed a simultaneous motion to dismiss the Day family's complaint pursuant to Idaho Rule of Civil Procedure 12(b)(6). After hearing arguments on the motions, the district court dismissed the complaint on the grounds that 1) the plaintiffs lacked standing as to the breach of contract claim; 2) all plaintiffs, except for Donna and David R. Day, lacked standing for the inverse condemnation claim; and 3) all three causes of action were barred by the applicable statute of limitations.

7

The Day family timely appealed. In *Day I*, this Court affirmed the district court's decision on the issue of standing on the inverse condemnation claim; however, we reversed the district court's decision on the statute of limitations and standing in relation to the breach of contract claim. We concluded that there was a genuine issue of material fact as to whether the Day family relied on ITD's agreement to toll the statute of limitations. *Day I*, 166 Idaho at 301, 458 P.3d at 170. This Court also provided guidance in addressing the duration of the tolling agreement, and instructed the district court to "evaluate the entirety of the parties' course of dealing when determining whether the action was timely filed." *Id.* at 302, 458 P.3d at 171.

On remand, the Days amended their complaint to add additional parties—Bennett G. Day and the Ernest and Lois Day Living Trust—since they owned interests in the Day Property in 1997. On December 14, 2020, a trial commenced to address whether 1) a taking had occurred, 2) the action was timely filed, and 3) ITD breached the 1967 Contract. Parry testified that he voluntarily made the statement regarding tolling the statute of limitations due to his belief that the parties were close to reaching a resolution and he did not want to unravel the progress they had made. Parry decided to place that language in the letter because Bohner had been aggressive about requesting a response and Parry was attempting to convey that ITD was working towards a resolution. Donna testified that she was "relieved" the statute of limitations had been "waived" because she thought there was additional work to be done. The district court found the plain language of Parry's letter was conditioned on an agreement on new access *not* being reached and concluded that Parry intended the agreement to toll the statute of limitations until ITD presented the Days with the final proposal in September.

The district court found that Donna's belief that ITD would not provide further assistance on the access issue was unreasonable because the express language of Parry's last letter on September 18, 2000, specifically invited the Days to reach out to him if further help was needed or issues arose. Further, the district court found that "Parry was motivated to help the Days find a solution, and he explicitly put the onus on the Days to respond." When they did not, the court explained, they "should have known that litigation was a possibility and that the statute of limitations may be running if no response was made to ITD."

The district court also noted that there was insufficient evidence presented at trial on whether ACHD had actually concurred with ITD's final proposed solution. Parry testified that he believed the access issue had been completely resolved once he issued the letter in September of

8

2000. In fact, he never heard from Bohner again regarding the Days' Property. Bohner's communications briefly turned to ACHD and then the Days began to search for alternative access from their neighbors. Parry testified that he relied on Bohner's and the Days' silence following the final proposal to mean that the agreement he proposed was accepted. The district court found that "[t]he Days did not rely on Parry's waiver and instead turned their focus to ACHD, negotiating an agreement with neighbors on different access, and selling the Property."

The district court examined the parties' communications after 2009, in compliance with this Court's instruction in *Day I* to "evaluate the entirety of the parties' course of dealing when determining whether the action was timely filed." 166 Idaho at 302, 458 P.3d at 171. The district court found that ITD's post-2009 efforts were not an attempt to reach a settlement with the Days; rather, ITD was acting to assist the Days in working with ACHD and their neighbors to resolve their continuing issues of access to their property.

After 14 days of trial and the conclusion of the plaintiffs' case-in-chief, ITD filed a motion for involuntary dismissal pursuant to Idaho Rule of Civil Procedure 41(b)(2). The district court found that although the Days had established that a taking had occurred, there was no breach of contract and the inverse condemnation action was untimely; accordingly, it granted the defendant's motion and dismissed the case. Regarding the timeliness of the inverse condemnation claim, the district court found that the statute of limitations had only been tolled during the two-month period after Parry sent his July 2000 letter until the final proposal was sent to the Days in September of 2000. It further concluded that the Days failed to demonstrate that they relied upon the agreement to toll the statute of limitations.

After ITD prevailed in the district court, it filed a motion for attorney fees pursuant to Idaho Code section 12-120(3). The Days filed an untimely objection, asserting the suit was not based on a commercial transaction but an inverse condemnation claim. In examining Idaho Code section 12-117, the district court concluded that an award of attorney fees was unwarranted because the Days had not acted without a reasonable basis in fact or law. By ITD's own admission, it was a case of "complex legal issues" and "novel questions." For purposes of determining whether this was a commercial transaction under section 12-120(3), the district court considered the arguments on the merits and ultimately denied attorney fees to ITD. The court concluded that "a commercial transaction was not integral to the inverse condemnation claim." Further, the district court determined that the requested fees were not apportioned, and the claims were inseparably

intertwined. ITD moved for clarification to determine whether the attorney fees were denied because the claims were inseparably intertwined or because ITD failed to apportion their fees. ITD also submitted additional documentation estimating 20% of their billable time had been incurred solely on the breach of contract claim. The district court again denied all attorney fees, clarifying that in addition to the section 12-120(3) issue, it declined to award fees for two alternative reasons: the claims were inseparably intertwined *and* ITD failed to apportion its fees. It also held that the information apportioning the fees was untimely.

The Days timely appealed to this Court. ITD cross-appealed on the issue of the denial of its attorney fees.

## II. STANDARD OF REVIEW

"When a defendant moves for an involuntary dismissal [pursuant to Idaho Rule of Civil Procedure 41(b)] at the close of the plaintiff's presentation in a non-jury case, the court sits as a trier of fact and is not required to construe all evidence and inferences to be drawn therefrom in the light most favorable to the plaintiff." *Spirit Ridge Min. Springs, LLC v. Franklin County*, 157 Idaho 424, 426, 337 P.3d 583, 585 (2014) (quoting *Keenan v. Brooks*, 100 Idaho 823, 825, 606 P.2d 473, 475 (1980)). "The district court is not limited in its evaluation of the evidence as it would be on a motion for a directed verdict; instead the district court may weigh the evidence." *Id.*

"A reviewing court will uphold factual findings made by the trial court in granting a motion for involuntary dismissal so long as those findings are not clearly erroneous," meaning they are unsupported by substantial and competent evidence. *Id.*; *Tricore Invs., LLC v. Est. of Warren through Warren*, 168 Idaho 596, 610, 485 P.3d 92, 106 (2021). Under the clearly erroneous standard, the district court's "findings of fact will be liberally construed in favor of the judgment entered." *Tricore Invs.*, 168 Idaho at 610, 485 P.3d at 106 (quoting *Wilson v. Mocabee*, 167 Idaho 59, 64, 467 P.3d 423, 428 (2020)). "However, this Court exercises free review over the district judge's conclusions of law." *Frost v. Gilbert*, 169 Idaho 250, 263, 494 P.3d 798, 811 (2021) (quoting *Turcott v. Est. of Bates*, 165 Idaho 183, 188, 443 P.3d 197, 202 (2019)).

## III. ANALYSIS

In their second appeal to this Court, the Days argue that the district court erred, following remand and the bench trial that ensued, by: (1) failing to consider their argument that quasi-estoppel barred ITD from asserting a statute of limitations defense; (2) improperly finding that the Days had not relied on the statute of limitation agreement; and (3) failing to sufficiently address

the entirety of parties' course of dealing when considering whether the action had been timely filed. ITD responds by noting that the Days' quasi-estoppel argument was improperly raised and that the record supports the district court's findings and conclusions regarding the statute of limitations. ITD has also cross-appealed on the district court's denial of attorney fees under Idaho Code section 12-120(3), asserting that the district court erred in finding that the gravamen of the suit was not a commercial transaction.

## A. Although not directly addressed by the district court, its findings show that it implicitly rejected the Days' argument that quasi-estoppel barred ITD from asserting a statute of limitations defense.

In the district court's order granting ITD's motion to dismiss, it did not discuss the Days' quasi-estoppel theory. Instead, it concluded that the evidence demonstrated ITD had secured reasonable access for the Days prior to the 1997 interchange project. The fact that the interchange project—completed decades later—destroyed a portion of that access did not give rise to the breach of contract claim because ITD had already performed its duties under the 1967 Contract. Importantly, the Days are not appealing the district court's determination that there was no breach of the 1967 Contract. Rather, on appeal, they argue that quasi-estoppel should preclude ITD from asserting a statute of limitations defense. ITD suggests that the Days have raised this quasi-estoppel argument for the first time on appeal, so it should not be reached by this Court.

### 1. The Days' quasi-estoppel argument was preserved.

Generally, "an issue presented on appeal must have been properly framed and preserved in the court below." *Centers v. Yehezkely*, 109 Idaho 216, 217, 706 P.2d 105, 106 (Ct. App. 1985). *See also* I.A.R. 35(a). To properly preserve an issue for subsequent appellate review, both the issue and the party's position on the issue must be raised before the trial court. *State v. Gonzalez*, 165 Idaho 95, 99, 439 P.3d 1267, 1271 (2019). Once that requirement has been met, the specific legal authorities used to support the position may evolve. *Id.*

Although the Days acknowledge that their argument has evolved, they maintain it was sufficiently preserved for review by this Court. Below, they argued that the doctrine of quasi-estoppel precluded ITD from asserting a statute of limitations defense because ITD's changing and inconsistent positions following the 1967 Contract prejudiced them. On appeal, the Days argue that ITD successfully asserted a statute of limitation defense. They claim this violates the terms of Parry's July 19, 2000, letter.

11

Both arguments were ultimately based on the Days' underlying premise that ITD had already agreed to provide access to the Day Property in 1967. While the Days have focused on different documents (the 1967 Contract and the July 2000 letter) to establish their right to access, we agree that this is merely a refinement of the broad argument they raised below and in their first appeal to this Court, which focused heavily on the letter from ITD. The Days' position on the 1967 Contract has been narrowed—not broadened—to assert that the July 2000 letter was an extension of time to assert their rights under the contract. Thus, we will view this as a refinement rather than as a new argument. Inasmuch as the letter was admitted and cited below, we will consider the Days' quasi-estoppel argument.

   2.  *The district court made implicit findings that are tantamount to a rejection of the Days'*
        *quasi-estoppel theory.*

 "Quasi-estoppel is essentially a last-gasp theory under which a defendant who can point to no specific detrimental reliance due to plaintiff's conduct may still assert that plaintiffs are estopped from asserting allegedly contrary positions where it would be unconscionable for them to do so." *Trumble v. Farm Bureau Mut. Ins. Co. of Idaho*, 166 Idaho 132, 146, 456 P.3d 201, 215 (2019) (quoting *Schoonover v. Bonner Cnty.,* 113 Idaho 916, 919, 750 P.2d 95, 98 (1988)). "Quasi-estoppel prevents a party from changing its legal position and, as a result, gaining an unconscionable advantage or imposing an unconscionable disadvantage over another." *Hollingsworth v. Thompson*, 168 Idaho 13, 22–23, 478 P.3d 312, 321–22 (2020); *Garner v. Bartschi,* 139 Idaho 430, 437, 80 P.3d 1031, 1038 (2003). "Unlike equitable estoppel, quasi-estoppel does not require an undiscoverable falsehood, and it requires neither misrepresentation by one party nor reliance by the other." *Hollingsworth*, 168 Idaho at 23, 478 P.3d at 322. Quasi-estoppel applies when:

> (1) the offending party took a different position than his or her original position and
> (2) either (a) the offending party gained an advantage or caused a disadvantage to
> the other party; (b) the other party was induced to change positions; or (c) it would
> be unconscionable to permit the offending party to maintain an inconsistent position
> from one he or she has already derived a benefit or acquiesced in.

*Id.* (quoting *Trumble*, 166 Idaho at 136, 456 P.3d at 215).

The Days argue that the first element of quasi-estoppel has been met because ITD promised in July 2000 to replace the Days' access and to not assert the statute of limitations. They maintain that the second element has been met because ITD gained an unconscionable advantage by changing its position and asserting the statute of limitations defense, thereby allowing ITD to avoid

12

litigation in 2000 and preventing the Days from recovering on an inverse condemnation claim in the future. ITD contends that there was not a change in position; rather, it believes it had fulfilled its promise to provide an alternative access point and toll the statute of limitations. Additionally, ITD notes that even if the final proposal in the September 2000 letter did not immediately terminate the brief tolling of the statute of limitations, it would not be unconscionable for ITD to assert a statute of limitations defense over a decade after the applicable statute of limitations would have run.

The Days rely on *Hollingsworth v. Thompson*, in which this Court found quasi-estoppel applied when a hospital changed its position by holding itself out as a private corporation in its business filings with the Idaho Secretary of State, but then later maintained it was a governmental entity when sued. The public filings led the plaintiffs to believe the hospital was a private corporation, causing them to disregard the ITCA notice deadline to the benefit of the hospital. 168 Idaho at 23, 478 P.3d at 322. However, unlike in *Hollingsworth*, the Days have failed to show that ITD took a different position than it had originally promised to the Days. The district court found that ITD's continued efforts to provide access ended September 18, 2000, when ITD informed the Days that it was its belief that it had provided the promised replacement access. The district court found that the agreement to toll the statute of limitations expired at that time because ITD believed an agreement was reached. All communications between the parties then ceased for eight years. When they resumed, communication was intermittent and addressed different issues, without mentioning the Days' belief that the statute of limitations had been waived or tolled. Additionally, the Days then sold their property during this interim period, although they later reacquired the property when the purchaser defaulted on the mortgage.

The district court's findings demonstrate that it had rejected the notion that quasi-estoppel prevented ITD from asserting a statute of limitations defense because ITD did not change its position. The court found that because ITD reasonably believed an agreement on access had been reached, the statute of limitations was no longer tolled, and it simply expired when the Days failed to bring a timely claim. In sum, based on the district court's findings, it could not have determined that it was unconscionable for ITD to assert a statute of limitations defense when the Days missed the statute of limitations deadline by more than a decade. Unlike in *Hollingsworth*, where the hospital was clearly taking contrary positions, ITD acted consistently with its testified belief that an agreement for access had been reached and the tolling of the statute of limitations had ceased.

13

Therefore, the findings of the district court cannot support a conclusion that the first element of quasi-estoppel was met when there was no evidence that ITD changed its position.

In relation to the second element of quasi-estoppel, creating an unconscionable disadvantage, the district court expressly found that a taking had occurred and that the Days had a viable inverse condemnation claim on the stipulated date of December 5, 1997. The Days argue that their disadvantage arises from ITD asserting the statute of limitations claim and it gained an unconscionable advantage in this litigation by doing so. The statute of limitations defense ultimately led to the Days' inverse condemnation claim being dismissed. However, the Days did not show how such a result is *unconscionable* considering the actions they took following the taking.

It is not an unconscionable result to allow ITD to assert a statute of limitations defense after it reasonably believed an agreement had been reached in September 2000, and then it did not hear from the Days again until 2008. During that time, the Days took no further action regarding access, despite threatening legal action during the summer of 2000. Their only communications were with ACHD in seeking advice on ITD's proposed roadway design, but then the Days never followed up on ACHD's request for additional information. The Days then sold the property to a third party before reacquiring it years later due to foreclosure. Once communications resumed in 2008 between the Days and ITD, it was sporadic. These communications were often unrelated to access and did not include any mention of ongoing tolling or waiver of the statute of limitations. From 2013 until the Days filed suit in 2016, the communication between the parties concerned requests from the Days for assistance from ITD in obtaining a roadway that would meet ACHD standards— a road that the district court found ITD was not required to provide. Thus, the facts found by the district court do not support a finding that the second element of quasi-estoppel can be met. Accordingly, we find that the district court implicitly rejected the Days' quasi-estoppel arguments.

In reaching this decision, we agree with the Days that the district court should have expressly addressed quasi-estoppel, as it was an issue clearly before the court. "It [is] incumbent on the district court to address all of the issues raised before it. It is not appropriate for this Court, for the first time on appeal, to address issues the district court failed to rule on." *Est. of Davis*, 167 Idaho 229, 235, 469 P.3d 16, 22 (2020). However, as we have previously determined, a lower court's decision on a matter may be implicit in its ruling. *See e.g., Lubcke v. Boise City/Ada Cnty. Hous. Auth.*, 124 Idaho 450, 463, 860 P.2d 653, 666 (1993) ("[E]ven though the district

14

court did not explicitly address the qualified immunity issue in responding to Worrell's motions to dismiss and post-trial motions, it is implicit in the court's rulings that it rejected Worrell's properly raised immunity claims."). That is the case here where the district court's detailed findings constituted an implicit repudiation of the Days' quasi-estoppel claim.

Accordingly, in reaching the merits of the Days' quasi-estoppel argument, we conclude that substantial and competent evidence in the record, as reflected in the district court's findings, supports the conclusion that ITD did not change its position in relation to locating a replacement access or the tolling of the statute of limitations. Thus, ITD, by asserting a statute of limitations defense in 2016, did not gain an unconscionable advantage as required by the doctrine of quasi-estoppel.

**B. The district court correctly found that the Days did not rely on ITD's continuous tolling of the statute of limitations.**

In *Day I*, this Court determined that there was a genuine issue of material fact as to whether the Day family detrimentally relied on the terms of Parry's July 2000 letter to toll the statute of limitations. 166 Idaho at 301–02, 458 P.3d at 170–71. We remanded the case so the district court could determine the duration of the agreement's effectiveness, noting that a statute of limitations could only be tolled "for a reasonable time." *Id.* at 302, 458 P.3d at 171. Once the Days had rested their case and ITD moved for dismissal pursuant to Rule 41, the district court found the Days "failed to demonstrate that they relied" upon Parry's promise to toll the statute of limitations after receiving the September 2000 letter. The Days argue that substantial and competent evidence exists in the record showing they relied on the agreement, based on the fact that they did not file an inverse condemnation claim against ITD earlier. ITD argues that the district court made numerous findings of fact following the trial, and those facts support the conclusion that the Days did not rely on the agreement to toll the statute of limitations.

"A reviewing court will uphold factual findings made by the trial court in granting a motion for involuntary dismissal so long as those findings are not clearly erroneous." *Spirit Ridge Min. Springs*, 157 Idaho at 426, 337 P.3d at 585. Under the clearly erroneous standard, the district court's "findings of fact will be liberally construed in favor of the judgment entered." *Tricore Invs.*, 168 Idaho at 610, 485 P.3d at 106. "Findings of fact that are supported by substantial and competent evidence are not clearly erroneous—even in the face of conflicting evidence in the record." *Id.* (quoting *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018)). "Substantial and competent evidence is relevant evidence which a reasonable mind might accept

15

to support a conclusion." *Id.* (quoting *Kelly v. Wagner*, 161 Idaho 906, 910, 393 P.3d 566, 570 (2017)).

*1. The Days' conduct from 2000 to 2016 does not show reliance on ITD's agreement to toll the statute of limitations.*

The mere fact that the Days waited to file their claim against ITD until 2016 does not add much, if anything, to their position that they relied on the agreement to toll the statute of limitations and altered their position. In other words, the Days argue that they did not file a claim because they relied on the tolling of the statute of limitations. Yet, they attempt to prove their reliance on the tolling by the mere fact that they did not file a timely claim. This argument relies on circular reasoning and the fallacy of affirming the consequent.[5] There could have been many reasons for the Days' delay in filing their claim. The Days' actions, or rather, lack of action, following the September 2000 letter from ITD, could just as easily resemble the actions of a property owner satisfied with the access provided to his property. Indeed, while Donna worked with neighbors regarding alternative routes for access to the Day Property, she did not mention a "waiver" or any tolling of the statute of limitations to them.

Additional facts also undermine the Days' argument that they believed access remained an unresolved issue and that they were waiting to file suit in reliance on the waiver. For instance, the Days did not respond to ITD's final proposal in 2000 even though Parry (1) asked the Days to let him know if there was anything else to be done, and (2) stated that he believed this proposal had solved the access issue. Donna even testified at trial that she thought there was nothing more ITD could do regarding access. The Days then sold the property in 2005 without informing the new buyer about the statute of limitations agreement. In short, the Days *never* discussed ITD's tolling of the statute of limitations with any prospective buyer, or the eventual buyer.

In the time following Parry's letter and subsequent final proposal sent in September 2000, ITD took no further action to provide the Days with access, nor did the Days ask them to do so, until 2011. The record shows that there was silence between the Days and ITD from 2000 until 2008. This was followed by communication regarding title issues from 2009 to 2011 and then further silence between the parties during 2012. While ITD employees assisted the Days from

---

[5] This logical fallacy, in which causes and effects are improperly treated as interchangeable, is demonstrated by the following example: If I have the flu, I will have a fever. I have a fever; therefore, I must have the flu. Here the Days' argument follows this same pattern: If the statute of limitations was tolled, we would wait to file. Since we waited to file, the statute of limitations must have been tolled.

16

2013 to 2016 in obtaining an approach from ACHD, this is not equivalent to a continuation of the negotiations for a replacement access in September 2000. Those negotiations ended in September 2000 and were never revisited. Although the Days attempt to reverse the argument, pointing out that no evidence was provided to show that they did not rely on an ongoing agreement to toll the statute of limitations, the district court concluded that the Days had the burden to show reliance. The court then concluded that their burden had not been met because the actions taken by the Days, including the entire course of their dealings with ITD, failed to provide substantial and competent evidence of their reliance.

On appeal, the Days point to facts in the record they claim support their assertion that the district court erred. They primarily focus on the lack of a withdrawal of the waiver by ITD and ITD's continued assistance to the Days. While these facts may provide limited support to the Days' reliance argument, the weight of the findings made by the district court demonstrate that the Days did not act in reliance on the waiver. The court found it compelling that the Days never mentioned the alleged waiver to their neighbors during negotiations for access or when they sold their property. Likewise, the Days ceased communicating with ITD following receipt of ITD's final proposal and instead chose to sell the land.

The trial court, as the fact finder, weighed all these facts in the balance and reached the conclusion that these were not the actions of a party who believed the statute of limitations was tolled. This conclusion is supported by substantial and competent evidence in the record. Accordingly, we affirm the district court's determination that the Days did not rely on the waiver.

**C. As instructed to do on remand, the district court evaluated the entirety of the parties' course of dealing in determining that the Days' inverse condemnation claim was not timely filed.**

*1. The duration of ITD's agreement in relation to the statute of limitations expired once the Days failed to respond to the final proposal.*

In *Day I*, this Court instructed the district court on remand to evaluate the entirety of the parties' course of dealing in determining whether the inverse condemnation claim had been timely filed. 166 Idaho at 302, 458 P.3d at 171. It did so and found that the inverse condemnation claim was untimely because ITD only agreed to toll the statute of limitations until September 18, 2000, when Parry's final proposal was sent. The court below concluded that under any reasonable interpretation of the letter, the statute of limitations would have expired before 2008, well before the date of the Days' initial filing in 2016. In *Day I*, this Court held even if we construed the letter

17

as granting a waiver, a perpetual or indefinite waiver of the statute of limitations would be void as against public policy because a waiver is valid only for a reasonable time, and that reasonable time is not defined by the applicable statute of limitations. *Id*.

In remanding the case, we explained that "the district court, sitting as a trier of fact on the inverse condemnation claim, must evaluate the entirety of the parties' course of dealing when determining whether the action was timely filed." *Id*. The district court first considered the duration of ITD's agreement to toll the statute of limitations in determining whether the Days' claim had been timely filed. "Waiver is foremost a question of intent*." River Range, LLC v. Citadel Storage, LLC*, 166 Idaho 592, 601, 462 P.3d 120, 129 (2020) (quoting *Knipe Land Co. v. Robertson*, 151 Idaho 449, 457, 259 P.3d 595, 603 (2011)). "The party alleging waiver must show a clear intention by the other party to waive before waiver will be established." *Id.* "Importantly, the party asserting waiver must also show that he acted in reasonable reliance upon [the waiver] and that he thereby has altered his position to his detriment*." Pocatello Hosp., LLC v. Quail Ridge Med. Inv., LLC*, 156 Idaho 709, 719, 330 P.3d 1067, 1077 (2014) (alteration in original) (internal citations and quotation marks omitted). *See also Magic Valley Foods, Inc. v. Sun Valley Potatoes, Inc.*, 134 Idaho 785, 788, 10 P.3d 734, 737 (2000) (concluding waiver was not established when seller failed to show detrimental reliance on buyer's waiver of a payment term). "Waiver is a question of fact and requires a showing of substantial evidence on the record." *A & B Irrigation Dist. v. Aberdeen-Am. Falls Ground Water Dist. (In re SRBA Case No. 39576)*, 141 Idaho 746, 754, 118 P.3d 78, 86 (2005) (citing *Riverside Dev. Co. v. Ritchie*, 103 Idaho 515, 518, 650 P.2d 657, 660 (1982)).

Of course, the district court was tasked with more than just applying a reasonable interpretation of the parties' correspondence—it was asked to examine the history of the Days' interactions with ITD. The district court found that the course of dealing between the parties, prior to the final proposal being sent in 2000, demonstrates consistent and persistent communication, especially after Bohner became involved on behalf of the Days. There was a flurry of communication between Bohner and Parry at ITD regarding getting the Days a final proposal related to replacement access. Parry testified he added the language tolling the statute of limitations in order to give ITD time to come up with a final proposal. He wanted to avoid unraveling the progress the parties had made until a final proposal could be presented to the Days. Once that final proposal was sent two months later, Parry asked the Days to inform him if there was anything else

to be done, and it was his understanding that with the submission of the final proposal, an agreement had been reached unless he was informed otherwise.

These facts support the district court's finding that once the proposal was sent by Parry, ITD reasonably assumed that an agreement had been reached since they did not hear from the Days again until 2008. The facts in the record support the finding that ITD believed an agreement had been reached and the tolling ceased. The lack of any response from the Days is telling, especially since prior to the proposal being sent, communication from the Days was frequent and often pressed ITD for quick responses.

The Days argue that the tolling agreement's duration should be defined by its plain language and, therefore, should have continued until it was clear that an agreement could not be reached. The Days are correct that in *Day I*, this Court considered the plain language of the letter to determine whether the statute of limitations had been tolled, but in considering the duration of the "waiver," this Court remanded for the district court to consider the parties' course of dealing. 166 Idaho at 301–02, 458 P.3d at 170–71. In light of the possibility that the parties could never reach an agreement, the Days' assertion that the "waiver" should have continued until an agreement with third parties on new access could not be reached would have resulted in an indefinite waiver. This interpretation goes against our prior holding that indefinite or perpetual waivers violate public policy. *Day I*, 166 Idaho at 302, 458 P.3d at 171.

The Days also argue that the district court should have focused more on determining whether the parties reached an agreement on access based on the final proposal from Parry in 2000. This argument treats the final proposal sent by Parry as a binding offer to which the Days never explicitly agreed. Under the circumstances of this case, which concerns access to real property, the Days' silence cannot be seen as acceptance. The district court found that the course of dealing between the parties, and the language in Parry's letters, should have put the Days on notice that the tolling of the statute of limitations would end once the final proposal was sent, unless they informed ITD that the arrangement was unsatisfactory. The record undermines the Days' argument here as Donna testified that she believed once the final proposal was received, Parry's "hands were tied somehow" and ITD would not do anything further regarding the access issue.

The district court found that given the communication and actions of the parties before the proposal, it was reasonable for ITD to believe that an agreement had been reached. Thus, the condition for the termination of the tolling agreement had been satisfied. The Days make multiple

19

arguments that the district court's finding is not supported by the record because the parties continued to work together for many years to reach an agreement. When a similar argument was made to the district court, it concluded that the Days were misconstruing the facts. The district court found, and the evidence supports, that communications between the parties from 2008 to 2010 involved title issues the Days were having with ACHD. While that, in part, involved access, the Days never asked ITD to make any changes to their access agreement. Communication between the parties was inconsistent after that, until ITD began working with the Days regarding ACHD building a roadway, which the district court found was simply the ITD employees acting as public servants rather than actions to avoid litigation. The Days' assertion that the parties continuously worked together for years to reach a new access agreement is simply not supported by the facts.

The Days also argue that since the final proposal was deficient and ineffective in resolving the lack of access, it could not have led to an agreement between the parties. Again, the district court was instructed to evaluate the parties' course of dealing to determine the duration of the tolling agreement, and the details of the final proposal did not change the district court's findings. If there was no agreement, it begs the question of why the Days did not reject the proposal, continue to negotiate with ITD, or file suit following their receipt of the September 2000 proposal. In the letter included with ITD's final proposal, Parry stated that he believed this was the solution for the access issues that the Days were experiencing. The district court found that after reviewing the course of dealing between the parties, it was reasonable for ITD to believe an agreement had been reached when the Days did not continue communicating with ITD after receipt of the proposal.

In *Day I*, we provided guidance to the district court about determining the duration of ITD's agreement to toll the statute of limitations, and instructed the district court as the trier of fact to evaluate the parties' course of dealing to determine if the action was timely filed. 166 Idaho at 302, 458 P.3d at 171. We uphold the factual findings of the district court as they are not clearly erroneous, and the facts found are supported by substantial and competent evidence. Determining whether the Days' actions were reasonable was the essential assignment for the district court on remand and it ultimately found that accepting the Days' arguments would result in an unreasonable waiver in violation of public policy. Instead, the district court appropriately found that the waiver effectively tolled the statute of limitations for two months and then expired once the Days received the final proposal from ITD. This finding is supported by the evidence adduced at trial and the

20

record shows that the district court fully considered the entire course of dealing between the parties. Thus, we affirm the decision of the district court.

> 2. *The district court evaluated the parties' course of dealing in determining that the Days' inverse condemnation claim had been untimely filed.*

"Civil actions can only be commenced within the periods prescribed . . . after the cause of action shall have accrued, except when, in special cases, a different limitation is prescribed by statute." I.C. § 5-201. "A cause of action accrues and the statute of limitations begins to run when a cause of action exists." *Swafford v. Huntsman Springs, Inc.*, 163 Idaho 209, 212, 409 P.3d 789, 792 (2017). A claim for inverse condemnation "must be commenced within four (4) years after the cause of action shall have accrued." I.C. § 5-224. Both parties stipulated that the statute of limitations on the inverse condemnation claim began running on December 5, 1997.

The district court, as the trier of fact, evaluated all actions taken by the parties from the time the taking occurred until the time this action was originally filed by the Days. The Days presented their case-in-chief over 14 days and called ten witnesses before resting. Over the objections of ITD that some evidence was irrelevant, the district court admitted all the evidence offered by the Days of the parties' communications after 2008 until the complaint was filed in 2016. After considering this evidence, the district court found that the agreement in Parry's letter tolled the statute of limitations for only two months, ending when the final proposal was sent to the Days. This finding is supported by substantial and competent evidence in the record and, therefore, we uphold the findings of the district court.

The district court found a reasonable interpretation of the duration of the tolling was that it expired on September 18, 2000, and so the statute of limitations for the inverse condemnation claim would have expired on or about February 4, 2002.[6] The district court also considered the possibility that the statute of limitations reset after the final proposal was presented, meaning the inverse condemnation claim would have had to have been filed by September 18, 2004. The district court determined that "under any reasonable interpretation of the duration of the waiver," the Days' suit was filed long after the most liberal interpretation of the statute of limitations would have required. This conclusion is supported by the evidence in the record and was reached by applying

---

[6] The district court concluded that the statute of limitations was tolled from July 19, 2000, to about September 18, 2000. Thus, the court concluded, it would be reasonable to conclude that the statute of limitations would expire on February 4, 2002, on the inverse condemnation claim (four years and two months after accrual) and February 4, 2003, on the breach of contract claim (five years and two months after accrual).

21

our instructions in *Day I*. Therefore, we conclude that the district court properly considered the parties' entire course of dealing and correctly determined that the Days' action against ITD was untimely filed. Accordingly, we affirm the district court's judgment in this matter.

### D. The district court did not err by declining to award attorney fees to ITD.

We next address ITD's cross-appeal from the district court's order denying its request for attorney fees under Idaho Code section 12-120(3). ITD argues that the district court erred because the gravamen of the action is a commercial transaction. ITD notes that the Days did not dispute that the breach of contract claim was a commercial transaction. However, the district court found that the inverse condemnation claim did not meet the elements of Idaho Code section 12-120(3) and was not a commercial transaction. The district court also concluded that the fees were not apportioned, and the claims were inseparably intertwined, which is why fees that may have been covered as relating to a breach of contract were not awarded. ITD filed a motion for clarification to determine whether the attorney fees were denied because the claims were inseparably intertwined or because ITD failed to apportion its fees. In the case of the latter, ITD submitted documentation apportioning the attorney fees. The district court again denied all fees, clarifying that it declined to award fees on both grounds and added that ITD's apportioned fee information was untimely.

Awarding attorney fees and costs is within the discretion of the trial court and subject to review for an abuse of discretion. *Idaho Transp. Dep't v. Ascorp, Inc.*, 159 Idaho 138, 140, 357 P.3d 863, 865 (2015); *Smith v. Mitton*, 140 Idaho 893, 897, 104 P.3d 367, 371 (2004). "In making this determination, this Court conducts a four-part inquiry to determine whether the trial court: "(1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Lunneborg*, 163 Idaho at 873, 421 P.3d at 204. However, "[w]hether an action is based on a commercial transaction is a question of law over which this Court exercises free review." *Intermountain Real Props., LLC v. Draw, LLC*, 155 Idaho 313, 320, 311 P.3d 734, 741 (2013).

While not expressly stated, ITD seems to argue that the district court abused its discretion by not acting consistently with the legal standards applicable to it in determining whether the gravamen of the inverse condemnation claim is a commercial transaction. Idaho Code section 12-120(3) provides that:

22

> In any civil action to recover on an open account, account stated, note, bill, negotiable instrument, guaranty, or contract relating to the purchase or sale of goods, wares, merchandise, or services and in any commercial transaction unless otherwise provided by law, the prevailing party shall be allowed a reasonable attorney's fee to be set by the court, to be taxed and collected as costs.
>
> The term "commercial transaction" is defined to mean all transactions except transactions for personal or household purposes. The term "party" is defined to mean any person, partnership, corporation, association, private organization, the state of Idaho or political subdivision thereof.

Where Idaho Code section 12-120(3) applies, an award of attorney fees to the prevailing party is mandatory. *Merrill v. Gibson*, 139 Idaho 840, 845, 87 P.3d 949, 954 (2004). There is no dispute in this case that ITD was the prevailing party in the district court, and the Days do not argue otherwise in their objection to ITD's request for attorney fees.

We have previously determined that section 12-120(3) applies if a commercial transaction is "integral to the claim" and also "constitute[s] the basis upon which the party is attempting to recover." *Knudsen v. J.R. Simplot Co.*, 168 Idaho 256, 272, 483 P.3d 313, 329 (2021); *Reynolds v. Trout Jones Gledhill Fuhrman, P.A.*, 154 Idaho 21, 26–27, 293 P.3d 645, 650–51 (2013) (quoting *Carrillo v. Boise Tire Co.*, 152 Idaho 741, 755–56, 274 P.3d 1256, 1270–71 (2011)). In other words, recovery of attorney's fees under section 12-120(3) hinges on "whether the gravamen of a claim is a commercial transaction." *Sims v. Jacobson*, 157 Idaho 980, 985, 342 P.3d 907, 912 (2015) (citation omitted).

"[C]ourts analyze the gravamen claim by claim." *Id.* "Yet, where there are multiple claims in an action, and only some qualify for a fee award under section 12-120(3), attorney's fees are properly denied if those claims are 'inseparably intertwined.' " *Knudsen*, 168 Idaho at 273, 483 P.3d at 330 (citation omitted). *See also Brooks v. Gigray Ranches, Inc.*, 128 Idaho 72, 77–79, 910 P.2d 744, 749–51 (1996). When a party has prevailed on claims for which it is statutorily entitled to an award of attorney's fees and claims upon which it is not, this Court has held "that the prevailing party must apportion the fees between the claim upon which it was entitled to recover . . . and the claim upon which it was not." *Advanced Med. Diagnostics, LLC v. Imaging Ctr. of Idaho, LLC*, 154 Idaho 812, 815, 303 P.3d 171, 174 (2013). "Where fees were not apportioned between a claim that qualifies under I.C. § 12-120(3) and one that does not, no fees are to be awarded." *Rockefeller v. Grabow*, 136 Idaho 637, 645, 39 P.3d 577, 585 (2001) (citing *Brooks*, 128 Idaho at 79, 910 P.2d at 752). This Court has stated that simply because "both parties have asked for attorney fees under section 12-120(3) does not mean such an award is automatically

appropriate." *Knudsen*, 168 Idaho at 272–73, 483 P.3d at 329–30 (alteration in original) (citation omitted); *Brunobuilt, Inc. v. Strata, Inc.*, 166 Idaho 208, 222, 457 P.3d 860, 874 (2020) (citing *Soignier v. Fletcher*, 151 Idaho 322, 326–27, 256 P.3d 730, 734–35 (2011)). "Although the parties requested fees on this basis, the party seeking fees must also demonstrate a commercial transaction was the gravamen of each claim." *Knudsen*, 166 Idaho at 272–73, 483 P.3d at 329–30.

In reviewing the case before us on a claim by claim basis, we conclude that the gravamen of this suit was an inverse condemnation claim—a constitutional action—and concerned accessibility to the Day Property. While there was a breach of contract claim raised in this suit, the inverse condemnation claim itself arose out of the 1997 taking. It was not part of a transaction or commercial relationship, nor was the inverse condemnation claim dependent on the 1967 Contract. Thus, we cannot agree with ITD's contention that the gravamen of the suit was commercial in nature.

We also note that the Days' earlier request for fees under Idaho Code section 12-120(3) is not dispositive to finding that the gravamen of the claim is a commercial transaction. *Knudsen*, 168 Idaho at 272–73, 483 P.3d at 329–30. We have held that " '[a]llegations in the complaint that the parties entered into a commercial transaction and that the complaining party is entitled to recover based upon that transaction, are sufficient to trigger the application of I.C. § 12-120(3).' " *Carter v. Gateway Parks, LLC*, 168 Idaho 428, 441, 483 P.3d 971, 984 (2020) (alteration in original) (quoting *Garner v. Povey*, 151 Idaho 462, 470, 259 P.3d 608, 616 (2011)). We have typically applied this rule where, after substantive litigation, a party seeking fees attempted to change its characterization of the action. *See id.* at 440–41, 483 P.3d at 983–84; *Garner*, 151 Idaho at 471, 259 P.3d at 617. Equally applicable, however, is our rule that "[a] prevailing party may rely on I.C. § 12–120(3) if pled by another party for recovery of attorney fees" where "*it is warranted under the statute.*" *Garner*, 151 Idaho at 470, 259 P.3d at 616 (emphasis included). Thus, "[a] party seeking fees based on a mere request under I.C. § 12–120(3) must show that a commercial transaction was the gravamen of the action before a court may award fees." *Id.*

Both parties asked for fees under Idaho Code section 12-120(3), but that fact alone does not automatically entitle the prevailing party to an award under the statute. ITD, as the prevailing party seeking fees, was required to demonstrate that a commercial transaction was the gravamen of each claim. *Knudsen*, 168 Idaho at 272–73, 483 P.3d at 329–30; *Garner*, 151 Idaho at 470, 259

P.3d at 616. This ITD has failed to do. Because the district court properly determined that the gravamen of the Days' claim was the inverse condemnation issue, ITD is not entitled to attorney fees under Idaho Code section 12-120(3).

We also affirm the district court's determination that the claims were intertwined and not appropriately apportioned—decisions that are well within the bounds of the district court's discretion. Because the district court's findings were consistent with the legal standards applicable to it, we conclude that the district court did not abuse its discretion. We affirm the district court's denial of attorney fees on these grounds.

**E. Neither party is entitled to attorney fees on appeal.**

On appeal, ITD requests attorney fees pursuant to Idaho Code section 12-120(3) while the Days seek attorney fees under Idaho Code section 12-121. As just discussed, section 12-120(3) is inapplicable to this case where the gravamen of the claims is an inverse condemnation claim rather than a commercial transaction. Additionally, while ITD has prevailed as the respondent, it has not prevailed in its cross-appeal; thus, is not the prevailing party here. *Knudsen*, 168 Idaho at 274, 483 P.3d at 331 ("Where a party loses on its cross-appeal, it is not a prevailing party.").

Idaho Code section 12-121 provides, "[i]n any civil action, the judge may award reasonable attorney's fees to the prevailing party or parties when the judge finds that the case was brought, pursued, or defended frivolously, unreasonably or without foundation." "Where an appeal turns on questions of law, an award of attorney fees under [section 12-121] is proper if the law is well-settled and the appellant has made no substantial showing that the district court misapplied the law." *Elec. Wholesale Supply Co. v. Nielson*, 136 Idaho 814, 828, 41 P.3d 242, 256 (2001); *Andrews v. Idaho Forest Indus., Inc.,* 117 Idaho 195, 198, 786 P.2d 586, 589 (Ct. App. 1990). "When an appeal simply disputes the trial court's factual findings, which are supported by substantial although conflicting evidence, the appeal is considered frivolous, and an award of attorney fees is proper under [Idaho Code section] 12-121." *Elec. Wholesale*, 136 Idaho at 828, 41 P.3d at 256.

We conclude that the Days are not entitled to attorney fees. Notwithstanding our denial of ITD's cross-appeal on attorney fees, the Days are not the prevailing party on appeal nor have they shown ITD defended the case frivolously, unreasonably, or without foundation. Both parties raised complex and novel legal issues stemming from an inverse condemnation claim and a complicated

property history. Accordingly, we conclude that attorney fees will not be awarded under either statute.

## IV. CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court. Because both parties prevailed in part, we do not award costs or attorney fees on appeal to either side.

Chief Justice BEVAN, Justices BRODY, STEGNER and ZAHN **CONCUR.**